# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

| | | |
|---|---|---|
| **JAMES ALBERT LANGLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:17-cv-03520** |
| | ) | |
| **HUNTINGTON POLICE DEPT,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court are the following: (1) Defendants PrimeCare Medical, Inc. and Nurse Jalayna Leonburg's "Motion to Dismiss Complaint and Alternative Motion for Summary Judgment" (Document No. 29), filed on August 9, 2017; (2) Defendants PrimeCare Medical, Inc., Nurse Jalayna Leonburg, and Jennifer Hatfield's "Motion to Dismiss Amended Complaint and Alternative Motion for Summary Judgment" (Document No. 64), filed on September 25, 2017; (3) Plaintiff's "Motion for Summary Judgment" (Document No. 76), filed on September 27, 2017; (4) Defendant West Virginia Department of Corrections' "Motion to Dismiss" (Document No. 91), filed on October 17, 2017; (5) Defendant David Ballard's "Motion to Dismiss for Failure to Serve" (Document No. 92), filed on October 17, 2017; (6) Defendants Dr. Charles Lye, Donna Warden, Wexford Health Sources Inc.'s "Motion to Dismiss" (Document No. 95), filed on October 19, 2017. The Court notified Plaintiff pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendants' Motions and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by the Defendants in moving to dismiss. (Document Nos. 33, 66, 98.) Plaintiff has filed a Response to all of the above Motions. (Document Nos. 45, 85, 99, 139, 140.) Defendants Hatfield, Leonburg,

PrimeCare, Dr. Lye, Warden, and Wexford Health have filed Replies (Document Nos. 90 and 115) and Plaintiff filed his Surreply (Document No. 100). Having examined the record and considered the applicable law, the undersigned has concluded as follows:

(1) PrimeCare Defendants' "Motion to Dismiss Amended Complaint and Alternative Motion for Summary Judgment" (Document No. 64) should be granted;

(2) PrimeCare Defendants' "Motion to Dismiss Complaint and Alternative Motion for Summary Judgment" (Document No. 29) should be denied as moot;

(3) Plaintiff's "Motion for Summary Judgment" (Document No. 76) should be denied;

(4) Defendant West Virginia Department of Corrections' "Motion to Dismiss" (Document No. 91) should be granted;

(5) Defendant Ballard's "Motion to Dismiss for Failure to Serve" (Document No. 92) should be denied as moot; and

(6) Defendants Dr. Charles Lye, Donna Warden, Wexford Health Sources Inc.'s "Motion to Dismiss" (Document No. 95) should be denied.

## PROCEDURAL BACKGROUND

On July 3, 2017, Plaintiff, acting *pro se,* filed his Motion to Proceed Without Prepayment of Fees and Complaint claiming entitlement to relief pursuant to Title 42 U.S.C. § 1983.[1] (Document Nos. 1 and 2.) In his Complaint, Plaintiff names the following as Defendants: (1) "Huntington WV Police Department (HPD) (Arresting Officer);" (2) "Western Regional Jail (WRJ) (C.O. Michael York);" (3) Prime Care Medical Inc. (Nurse Jolaina);" (4) "Wexford Health Sources Inc. (Dr. Charles Lye);" and (5) "W.V. Department of Corrections (Commissioner Jim Rubenstein)." (Document No. 2, p. 2.) Plaintiff alleges that Defendants acted with negligence and

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

violated his constitutional rights under the Eighth Amendment by failing to provide him with appropriate and necessary medical care. (Id.) Plaintiff alleges that on July 11, 2015, he was involved in a car accident where his car crashed into a building at a speed of 45 mph. (Id., p. 7.) Plaintiff claims that when he exited the vehicle, he was attacked by a K-9 Unit dog. (Id.) Plaintiff acknowledges that he was "listed as an escapee from work release" at the time of the accident. (Id.) Plaintiff complains that he requested transportation to the hospital, but his request was denied by the arresting officer due to Plaintiff's escape status. (Id.) Plaintiff, however, states that his passenger was transported to the hospital. (Id.) Plaintiff states that he was transported HPD's headquarters, and then to the Western Regional Jail where he was placed in the booking area. (Id., p. 8.) Plaintiff contends that when his name was called the next day (July 12, 2015), he "could not physically get off the floor." (Id.) Plaintiff claims that C.O. York and Nurse Jalayna "had to pick me up and move me to H-2 holding cell by myself in front of their desk." (Id., p. 9.) Plaintiff alleges that he again requested to be transported to the hospital, but "was told no because I was listed as an excapee." (Id.) Plaintiff contends that Nurse Jalayna, who is employed by PrimeCare Medical, gave him "a superficial intake physical" and stated that his dog bite wounds were only scratches. (Id.) Plaintiff asserts that Nurse Jalayna refused to send Plaintiff to the hospital for x-rays because she had ordered a "mobile x-ray lab to come to the facility." (Id., pp. 9 – 10.) Plaintiff states that the "mobile x-ray lab" never showed. (Id.) Plaintiff claims that he was held in the H-2 holding until the evening of July 12, 2015, when he was "medically cleared" by Nurse Jalayna to go to general population without any x-rays being performed by the mobile x-ray. (Id., p. 10.) Plaintiff asserts that C.O. York escorted him to Section F-5 of general population. (Id., p. 9.) Plaintiff claims that he was "severely injured and C.O. York observed this and did nothing to

intervene." (<u>Id.</u>) Plaintiff further alleges that "even a lay person could see I was physically hurt." (<u>Id.</u>)

Plaintiff alleges that he was transported to Mount Olive Correctional Complex ("MOCC") on July 13, 2015, where his medical care was provided by Wexford Health Sources, Inc. (<u>Id.</u>, p. 10.) Plaintiff alleges that a nurse conducted his intake screening, where pictures were taken of his "head trauma, bumps, knots, scrapes, and a dog bite puncture wound to my left buttock." (<u>Id.</u>) Plaintiff claims that he informed the intake nurse of his automobile accident and she placed Plaintiff on the list to be evaluated by Dr. Charles Lye. (<u>Id.</u>) Plaintiff contends that from July 13, 2015 through November 1, 2015, he filed 13 sick call requests complaining of "loss of motor skills in hands, severe muscle cramps in back, loss of breath, fever, not being able to breathe, and telling the provider I was in a serious car wreck that I needed to go to an outside doctor for an MRI or CT scan." (<u>Id.</u>, pp. 10 – 11.) Despite advising medical staff that "something was affecting [him] severely, Plaintiff alleges that Dr. Lye only performed a "few superficial examination" and "mainly just protocoled Motrin and stated [Plaintiff] was ok." (<u>Id.</u>, p. 10.) Plaintiff acknowledges that Dr. Lye ordered an x-ray on September 24, 2015, but complains that the x-ray was delayed. (<u>Id.</u>) Plaintiff further states that no antibiotics were provided from July 13, 2015 through October 20, 2015. (<u>Id.</u>) Plaintiff states that on October 6 and 7, 2015, Correctional Officers and Nurses Michelle and April had to come into his cell five times to help Plaintiff get out of bed and two times to help him out of the floor. (<u>Id.</u>, p. 12.) Plaintiff claims that Dr. Lye was on the premises on October 7, 2015, but refused to see Plaintiff until the next day. (<u>Id.</u>) Plaintiff states that on October 8, 2015, Dr. Lye performed an one minute examination and declared Plaintiff to be "physically fit." (<u>Id.</u>, p. 13.) Plaintiff states that the x-ray ordered on September 24, 2015, was finally

performed on October 21, 2015. (Id., p. 10.) Plaintiff states that "upon completion of said chest x-ray, [he] was immediately transferred from segregation to MOCC infirmary and started on antibiotics." (Id.) Plaintiff alleges that the radiologist report from CAMC Memorial Hospital dated October 21, 2015, recommended that Plaintiff be transported to the hospital for a CT scan. (Id., pp. 11 – 12.) Plaintiff states that Dr. Lye and Wexford Health Sources ignored this recommendation "to save as much money as possible" and "to cover the blatant medical neglect that had allowed [Plaintiff] to become so sick." (Id., p. 13.) Plaintiff claims that he was kept in the MOCC infirmary "being pumped full of excessive doses of antibiotics and steroids for 10 more days until . . . staff was unable to get an EKG reading and had [Plaintiff] transferred to CAMC Memorial Hospital on November 1, 2015." (Id., p. 12.) Plaintiff contends that a CT scan was immediately conducted upon his arrival at CAMC and Plaintiff was rushed into surgery to have a complete thoracotomy of his left lung. (Id.) Plaintiff states that he "had double pneumonia so bad that it had collapsed [his] left lung, ate through the lung into [his] back and caused [his] body to go into sepsis." (Id.) Plaintiff claims that three liters of infection was drained from his lungs over a five hour period. (Id.) Plaintiff states he was placed in the surgical intensive care unit for 18 days. (Id., p. 13.) Due to the foregoing, Plaintiff alleges that he has lost partial use of his left lung, nerve damage to his complete left side, and his diaphragm is disconnected from his lung. (Id., p. 12.) Plaintiff further states that his kidneys were damages by the "high doses of antibiotics and steroids" that were administrated from October 21, 2015 through November 1, 2015. (Id., p. 13.) Plaintiff, therefore, states that he is partially disabled and permanently disfigured. (Id.)

Plaintiff alleges that he filed five grievances from July 13, 2015 through November 1, 2015, complaining of inadequate medical care and all grievances were denied. (Id., p. 10.) Plaintiff states

that Commissioner Jim Rubenstein "rubber stamped" all grievances denied without conducting "any real investigation." (Id.) Plaintiff alleges that Commissioner Rubenstein's failure to investigate resulted in the violation of Plaintiff's Eighth Amendment rights. (Id.) As relief, Plaintiff requests "monetary compensation for his physical suffering and mental anguish," punitive damages," and "injunctive relief." (Id., p. 12.) As an Exhibit, Plaintiff attaches a copy of a newspaper article regarding his automobile accident. (Id., p. 20 – 21.)

By Order entered on April 16, 2015, United States Magistrate Judge Cheryl A. Eifert granted Plaintiff's Motion to Proceed Without Prepayment of Fees, directed the Clerk to issue a summons for the defendants, and directed the United States Marshals Service to serve the Summons and a copy of Plaintiff's Complaint upon each Defendant. (Document No. 10.) On August 1, 2017, Plaintiff filed a Motion to Compel requesting that the Court direct the Huntington Police Department to identify the name of the arresting officer. (Document Nos. 23.) By Order entered on August 7, 2017, Judge Eifert granted Plaintiff's Motion and ordered the Huntington Police Department to provide Plaintiff with the name of the arresting officer. (Document No. 25.) On August 7, 2017, Plaintiff filed a "Motion to Amend" requesting that the Court allow him amend this Complaint to allege that he filed seven grievance, instead of five grievance, as alleged in his original Complaint. (Document No. 28.) Additionally, Plaintiff attached the following Exhibits in Support of his Complaint: (1) A copy of a grievance dated August 1, 2015, requesting appropriate medical care for his back and neck injuries (Document No. 28, pp. 1 – 2.); (2) A copy of a grievance dated August 22, 2015, requesting appropriate medical care for his back and neck injuries (Id., pp. 3 – 4.); (3) A copy of a grievance dated September 14, 2015, requesting a jacket and a thermal top (Id., p. 5.); (4) A copy of a grievance dated September 28, 2015, requesting proper medical

treatment for his back and neck injuries by a doctor other than Dr. Lye (Id., pp. 6 – 7.); (5) A copy

of a grievance dated October 1, 2015, requesting proper medical treatment by Wexford Health or

to be referred to an outside specialist concerning his back and neck injuries (Id., pp. 8 – 9.); (6) A

copy of a grievance dated October 13, 2015, requesting to be taken to an outside specialist for

evaluation of Plaintiff spinal injury and nerve damage (Id., pp. 10 – 11.); and (7) A copy of a

grievance dated October 19, 2015, requesting a plastic chair to "help my back heal." (Id., pp. 12 –

13.)

On August 9, 2017, Defendants PrimeCare Medical and Nurse Jalayna Leonburg filed their

"Motion to Dismiss Complaint and Alternative Motion for Summary Judgment." (Document No.

29.) Specifically, Defendants argue that Plaintiff's Complaint should be dismissed based on the

following: (1) "Plaintiff's allegations regarding his medical treatment do not meet the legal

threshold for a viable civil rights claim under the 8th Amendment;" (2) "Plaintiff has failed to

comply with the Notice of Claim and Screening Certificate of Merit requirements of the MPLA;"

(3) "PrimeCare Medical of West Virginia, Inc. and Nurse Jalayna Leonburg are entitled to good

faith qualified immunity;" (4) "PrimeCare Medical of West Virginia, Inc. is not a 'person' subject

to suit until 42 U.S.C. § 1983." (Id.) In support, Defendants attach a copy of Plaintiff's medical

records. (Document No. 29-1.) Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir.

1975), was issued to Plaintiff on August 10, 2017, advising him of the right to file a response to

the Defendants' Motions.[2] (Document No. 33.) On August 14, 2017, Plaintiff filed a copy of

---

[2] On August 10, 2017, the above civil action was transferred from Judge Eifert to Judge Tinsley
for total pretrial management and submission of proposed findings of fact and recommendations
for disposition. (Document No. 31.) On the same day, due to a conflict of interest, the above civil
action was transferred from Judge Tinsley to the undersigned for total pretrial management and
submission of proposed findings of fact and recommendations for disposition. (Document No. 32.)

pertinent medical records as an Exhibit to his Complaint. (Document Nos. 37 and 37-1.) On August 21, 2017, Plaintiff filed his Response in Opposition to PrimeCare and Nurse Leonburg's "Motion to Dismiss Complaint and Alternative Motion for Summary Judgment." (Document No. 45.)

On August 15, 2017, Plaintiff filed a Motion to Amend Complaint. (Document No. 40.) Specifically, Plaintiff stated that he wished to amend as to the "naming and separating of all Defendants." (Id.) By Order entered on August 16, 2017, the undersigned granted Plaintiff's Motion to Amend and directed Plaintiff to file his Amended Complaint. (Document No. 43.) On September 11, 2017, Plaintiff filed his Amended Complaint. (Document No. 50.) Plaintiff names the following as Defendants: (1) Huntington Police Department ("HPD"); (2) the Arresting Officer; (3) PrimeCare Medical, Inc.; (4) Jalayna Leonburg; (5) Michael York; (6) Jennifer Hatfield; (7) Dr. Charles Lye; (8) Donna Warden; (9) Warden David Ballard; (10) West Virginia Department of Corrections ("WVDOC"); (11) Jim Rubenstein; and (12) Wexford Health Sources, Inc. (Id.) Plaintiff states that he is suing all Defendants in their official and individual capacities. (Id., p. 9.) First, Plaintiff states that "this Complaint is not a medical malpractice lawsuit, which requires the plaintiff to give (30) thirty days notice before filing the lawsuit." (Id., p. 1.) Plaintiff, however, alleges that Defendants violated his Eighth Amendment rights by failing to provide necessary and appropriate medical care. (Id.) As to the arresting officer (now identified as Alex Marshall), Plaintiff alleges that Defendant Marshall violated his constitutional right by acting with deliberate indifference to his need for medical care. (Id., p. 2.) Plaintiff alleges that he was involved in a high-speed car crash and then subdued by a K-9. (Id.) Plaintiff states that Defendant Marshall refused his request for transportation to the hospital despite his obvious injuries. (Id.) Plaintiff states that he was transported from the scene of the accident to HPD's headquarters, where the

Shift Commander and other officers refused to have Plaintiff transported to the hospital for evaluation and treatment. (Id., p. 3.) Plaintiff alleges that HPD is liable because it either allowed officers to violate policy or failed to properly train officers. (Id.)

As to PrimeCare Medical, Jalayna Leonburg, Jennifer Hatfield, and C.O. Michael York, Plaintiff alleges that the foregoing defendants acted with deliberate indifference to his medical needs during his detention at the Western Regional Jail ("WRJ"). (Id.) Plaintiff alleges that arrived at WRJ at approximately 12:00 a.m. on July 12, 2015. (Id.) Plaintiff states that Defendants Hatfield and Leonburg performed Plaintiff's intake physical. (Id.) Plaintiff claims that he advised Defendants Hatfield and Leonburg of his high-speed crash and showing them the K-9 puncture wounds and other injuries to his body. (Id.) Plaintiff states that he requested transportation to the hospital for an MRI or CT scan, but Defendants Hatfield and Leonburg denied the request due to status as being an "escape risk." (Id.) Plaintiff states that Defendant Leonburg advised him that a mobile x-ray had been ordered and Plaintiff was placed in a holding cell. (Id.) Plaintiff alleges that he went to sleep while in the holding cell and when he woke up he was unable to get off the floor due to his injuries. (Id.) Plaintiff claims that Defendant York and Leonburg had to "physically pick [him] up off the floor and then move [him] to holding cell 2, a single cell for observation." (Id., pp. 3 – 4.) Plaintiff alleges he was held in the single holding cell until the evening hours, when he was medically cleared for placement in general population by either Defendant Hatfield or Leonburg. (Id., p. 4.) Plaintiff complains that he was medically cleared despite the fact that his x-ray was never conducted. (Id.) Plaintiff asserts that Defendant York escorted him to general population despite his awareness of Plaintiff's injuries. (Id.) Plaintiff alleges that his injuries were obvious to even a layperson. (Id.) As to PrimeCare, Plaintiff alleges that PrimeCare violated its

policy by failing to take Plaintiff to an outside physician for treatment of his physical injury and failing to properly train its employee. (Id.)

Plaintiff alleges that on July 13, 2015, he was transferred from WRJ to MOCC where his medical care was provided by Wexford Health Sources and Dr. Lye. (Id., pp. 4 – 5.) Plaintiff states that upon his intake at MOCC, Plaintiff advised medical staff of his high-speed car crash and his injuries. (Id., p. 5.) Plaintiff states that photos were taken of his injuries and he was placed on the list to see Dr. Lye. (Id.) Despite the filing of 13 sick call slips and seven grievance requesting medical treatment, Plaintiff alleges that Dr. Lye only performed "superficial examinations" and determined Plaintiff to be in "good health." (Id.) Plaintiff states that medical staff "would only protocol Motrin." (Id.) Plaintiff acknowledges that Dr. Lye ordered an x-ray on September 24, 2015, but complains that the x-ray was delayed until October 21, 2015. (Id.) Plaintiff states that on October 6 and 7, 2015, correctional officers and nurses had to come into his cell five times to help Plaintiff get out of bed and two times to help him out of the floor. (Id.) Plaintiff claims that Dr. Lye was on the premises on October 7, 2015 and was notified by nurses that Plaintiff was "really bad," but Dr. Lye refused to see Plaintiff until the next day. (Id.) Plaintiff alleges that he was briefly examined by Dr. Lye on October 8, 2015, and Dr. Lye determined him to be in good health. (Id., p. 7.) Plaintiff states that the x-ray ordered on September 24, 2015, was finally performed on October 21, 2015. (Id., p. 6.) Plaintiff states that upon completion of the chest x-ray, Plaintiff was immediately transferred from segregation to the MOCC infirmary and started on antibiotics. (Id.) Plaintiff alleges that the radiologist's report from CAMC Memorial Hospital dated October 21, 2015, recommended that Plaintiff be transported to the hospital for a CT scan. (Id.) Plaintiff states that Dr. Lye and Wexford Health Sources ignored this recommendation due to their

10

policy of "sav[ing] money" and to cover up the lack of medical treatment. (Id.) Plaintiff claims that he was kept in the MOCC infirmary "for 10 more days being pumped full of liquid antibiotics and steroids at such a high dose that it hurt my kidneys." (Id.) Plaintiff states that he was transferred to CAMC Memorial Hospital on November 1, 2015, because Nurses Gordon and Tabitha "could not get an EKG reading." (Id.) Plaintiff contends that a CT scan was immediately conducted upon his arrival at CAMC and Plaintiff was rushed into surgery to have a complete thoracotomy of his left lung. (Id.) Plaintiff states that he "had double pneumonia so bad that it had collapsed [his] left lung, ate through the lung into [his] back and caused [his] body to go into sepsis." (Id.) Plaintiff claims that three liters of infection was drained from his lungs over a five-hour period. (Id., p. 7.) Plaintiff states he was placed in the surgical intensive care unit for 18 days. (Id.) Due to the foregoing, Plaintiff alleges that he has lost partial use of his left lung, nerve damage to his complete left side, and his diaphragm is disconnected from his lung. (Id.)

Plaintiff alleges that Warden David Ballard, RN Donna Warden, Former Commissioner Jim Rubenstein, and the WVDOC violation his Eighth Amendment rights because they were aware that he was receiving inadequate medical care and failed to taken any action. (Id., p. 8.) Plaintiff states that he filed seven grievances complaining that he was receiving inappropriate medical care. (Id.) Plaintiff states that all of his grievance were denied by Defendant Donna Warden and Warden Ballard despite his continued complaint that he was not receiving appropriate medical care. (Id.) Plaintiff alleges that Defendant Commissioner Jim Rubenstein denied his grievance without even "look[ing] into the problem." (Id.) Finally, Plaintiff claims that WVDOC "should have a failsafe to prevent such action as this." (Id., p. 9.)

On September 25, 2017, Defendants PrimeCare, Leonburg, and Hatfield filed their

11

"Motion to Dismiss Amended Complaint and Alternative Motion for Summary Judgment" and a Memorandum in Support. (Document Nos. 64 and 65.) Specifically, Defendants argue that Plaintiff's Complaint should be dismissed based on the following: (1) "Plaintiff's allegations regarding his medical treatment do not meet the legal threshold for a viable civil rights claim under the 8th Amendment;" (2) "Plaintiff's claims must be dismissed because he failed to exhaust his administrative remedies;" (3) "Plaintiff has failed to comply with the Notice of Claim and Screening Certificate of Merit requirements of the MPLA;" (4) "The Defendants are entitled to good faith qualified immunity;" and (5) "PrimeCare Medical of West Virginia, Inc. is not a 'person' subject to suit until 42 U.S.C. § 1983." (Id.) In support, Defendants attach the following: (1) A copy of Plaintiff's medical records from PrimeCare (Document No. 64-1.); and (2) A copy of Plaintiff's medical records from Wexford Health (Document No. 64-2.).

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on September 26, 2017, advising him of the right to file a response to the Defendants' Motions. (Document No. 66.) On September 27, 2017, Plaintiff filed his Motion for Summary Judgment. (Document No. 76.) On September 29, 2017, Plaintiff filed additional Exhibits in Support of his Complaint. (Document No. 80.) Specifically, Plaintiff attached a copy of the following: (1) A copy of Plaintiff's "Inmate Medical Services Request" dated July 20, 2015, requesting medical treatment for his severe headaches, lower back pain, neck pain, and numbness in fingers (Id., p. 1.); (2) A copy of Plaintiff's "Inmate Medical Services Request" dated July 30, 2015, requesting medical treatment for his back and neck pain (Id., p. 2.); (3) A copy of Plaintiff's "Inmate Medical Services Request" dated August 3, 2015, complaining of lower abdominal pain and stating that he was recently involved in a car crash (Id., p. 3.); (4) A copy of Plaintiff's "Inmate

Medical Services Request" dated August 15, 2015, complaining that he was not receiving his chronic care medications (Flomax, blood pressure medication, Prilosec, Motrin) (Id., p. 4.); (5) A copy of Plaintiff's "Inmate Medical Services Request" dated August 22, 2015, complaining that he was losing motor skills in his right hand due to nerve damages caused by the car crash (Id., p. 5.); (6) A copy of Plaintiff's "Inmate Medical Services Request" dated August 26, 2015, complaining of the loss of motor skills in his right hand due to nerve damages and requesting medical treatment (Id., p. 6.); (7) A copy of Plaintiff's "Inmate Medical Services Request" dated August 27, 2015, complaining of the loss of motor skills in his right hand due to nerve damages and requesting medical treatment (Id., p. 7.); (8) A copy of Plaintiff's "Inmate Medical Services Request" dated September 17, 2015, requesting the results of his neck x-ray (Id., p. 8.); (9) A copy of Plaintiff's "Inmate Medical Services Request" dated September 28, 2015, stating he had been diagnosed with spinal deterioration and complaining of the loss of motor skills in his right hand (Id., p. 9.); (10) A copy of Plaintiff's "Inmate Medical Services Request" dated October 1, 2015, requesting Motrin (Id., p. 10.); (11) A copy of Plaintiff's "Inmate Medical Services Request" dated October 9, 2015, requesting to know Dr. Lye's treatment plan because during the examination Dr. Lye "listened to my back and chest with his stethoscope" and then "said he's done" (Id., p. 11.); (12) A copy of Plaintiff's "Inmate Medical Services Request" dated October 11, 2015, complaining of "shortness of breath from the muscle spasms" and "blood in my mucus when I blow my nose" (Id., p. 12.); (13) A copy of Plaintiff's "Inmate Medical Services Request" dated October 13, 2015, request that Dr. Lye extend his prescriptions for Flexibill and Motrin and noting that he was still having back spasms (Id., p. 13.); (14) A copy of Plaintiff's "Inmate Medical Services Request" dated October 18, 2015, requesting antibiotics because he was "extremely

congested" (<u>Id.</u>, p. 14.); and (15) A copy of Plaintiff's "Inmate Medical Services Request" dated October 19, 2015, complaining of a sinus infection and chest congestion (<u>Id.</u>, p. 15.).

On October 3, 2017, Plaintiff filed his Response in Opposition to Defendants PrimeCare, Leonburg, and Hatfield's "Motion to Dismiss Amended Complaint and Alternative Motion for Summary Judgment." (Document No. 85.) On October 12, 2017, Plaintiff filed additional Exhibits in Support of his Complaint: (1) A copy of a grievance dated August 1, 2015, requesting appropriate medical care for his back and neck injuries (Document No. 89, pp. 1 – 2.); (2) A copy of a grievance dated August 22, 2015, requesting appropriate medical care for his back and neck injuries (<u>Id.</u>, pp. 3 – 4.); (3) A copy of a grievance dated September 14, 2015, requesting a jacket and a thermal top (<u>Id.</u>, p. 5.); (4) A copy of a grievance dated September 28, 2015, requesting proper medical treatment for his back and neck injuries by a doctor other than Dr. Lye (<u>Id.</u>, pp. 6 – 7.); (5) A copy of a grievance dated October 1, 2015, requesting proper medical treatment by Wexford Health or to be referred to an outside specialist concerning his back and neck injuries (<u>Id.</u>, pp. 8 – 9.); (6) A copy of a grievance dated October 13, 2015, requesting to be taken to an outside specialist for evaluation of Plaintiff spinal injury and nerve damage (<u>Id.</u>, pp. 10 – 11.); and (7) A copy of a grievance dated October 19, 2015, requesting a plastic chair to "help my back heal." (<u>Id.</u>, pp. 12 – 13.) On October 13, 2017, Defendants PrimeCare, Leonburg, and Hatfield filed their Reply to Plaintiff's Response in Opposition. (Document No. 90.)

On October 17, 2017, WVDOC filed its Motion to Dismiss Amended Complaint and Memorandum in Support. (Document Nos. 91 and 93.) Specifically, WVDOC argues that it "is not a 'person' for purposes of 42 U.S.C. § 1983." (<u>Id.</u>) Also on October 17, 2017, Defendant David Ballard filed his Motion to Dismiss Amended Complaint and Memorandum in Support.

14

(Document Nos. 92 and 94.) Specifically, Defendant Ballard argues that Plaintiff's Amended Complaint should be dismissed based on insufficient service of process. (Id.)

On October 19, 2017, Defendants Wexford, Lye, and Warden filed a "Motion to Dismiss" and Memorandum in Support. (Document Nos. 95 and 96.) In support, Defendants argue as follows: (1) "Plaintiff has failed to exhaust his administrative remedies;" (2) "Wexford Health Sources, Inc., is not a person pursuant to 42 U.S.C. § 1983;" (3) "There are not direct claims against Donna Warden, R.N., which would establish a claim of deliberate indifference and that the only claims against Donna Warden are in her role as Health Services Administrator in responding to grievances;" and (4) "The Complaint fails to allege sufficient facts, which if proven, could support a claim for violation of the Plaintiff's Eighth Amendment Rights by virtue of deliberate indifference on the part of said Defendants to any serious medical condition of Plaintiff." (Id.)

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on October 20, 2017, advising him of the right to file a response to the Defendants' above Motions. (Document No. 98.) On October 30, 2017, Plaintiff filed his Response in Opposition to Defendants Wexford, Lye, and Warden's Motion to Dismiss. (Document No. 99.) Also on October 30, 2017, Plaintiff filed his Surreply to Defendants PrimeCare, Leonburg, and Hatfield's Reply. (Document No. 100.) On November 2, 2017, Plaintiff filed a "Motion to Address All Defendants" setting forth facts and Exhibits in opposition to Defendants' Motion to Dismiss. (Document No. 101.) As an Exhibit, Plaintiff attaches the following: (1) A copy of the "Radiology Report" dated October 21, 2015 (Document No. 101-1, p. 1.); and (2) A copy of Plaintiff's Wexford medical records concerning September 21 and 24, 2015 (Id., p. 2.). On November 21, 2017, Defendants Wexford, Lye, and Warden filed their Reply to Plaintiff's Response in Opposition. (Document No.

115.) On December 12, 2017, counsel filed a "Waiver of Service of Summons" on behalf of David Ballard. (Document No. 135.) On December 18, 2017, Plaintiff filed his Responses in Opposition to Defendants WVDOC and Defendant Ballard's Motions to Dismiss. (Document Nos. 139 and 140.)

On January 2, 2018, Plaintiff filed his "Motion to Answer All Defendants' Motion to Dismiss."[3] (Document No. 142.) In the foregoing Motion, Plaintiff continues to argue that Defendants' motions to dismiss should be denied. (Id.) Plaintiff argues that Defendants Hatfield and Leonburg "chose to be deliberately indifferent to the Plaintiff's medical needs" by not making a "professional decision and send the Plaintiff to a qualified doctor." (Id., p. 2.) Plaintiff states that Defendants Warden, Ballard, and Rubenstein "failed to do any sort of investigation into any of the grievances that Plaintiff's filed." (Id.) Plaintiff claims that Defendant Lye acted with deliberate indifference by ignoring another doctor's recommendation and his own staff's report as contained in Plaintiff's medical records. (Id., p. 3.) Plaintiff states that Defendant Lye "almost killed the Plaintiff by being deliberately indifferent." (Id.) Plaintiff states that he has attached exhibits demonstrating Defendants' deliberate indifference to his serious medical needs. (Id.) As Exhibits, Plaintiff attaches the following: (1) A copy of Plaintiff's Wexford medical record from his incarceration at MOCC (Document No. 142-1); (2) A copy of Plaintiff's sick-call requests (Document No. 142-2.); (3) An article from Healthline regarding Empyema (Document No. 142-3.); (4) A copy of Plaintiff's medical records from Charleston Area Medical Center (Document No. 142-4.).

---

[3] By separate Order entered this day, the undersigned granted Plaintiff's "Motion to Address All Defendants" (Document No. 101) and "Motion to Answer All Defendants' Motion to Dismiss" (Document No. 142).

16

## THE STANDARD

### Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Id. at 556 U.S. at 679, 129 S.Ct. at 1950. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

This Court is required to liberally construe *pro se* documents, holding them to a less stringent standard than those drafted by attorneys. Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Loe v. Armistead, 582 F.2d 1291, 1295 (1978). Liberal construction, however, "does not require courts to construct arguments or theories for a *pro se* plaintiff because this would place a court in the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." Miller v. Jack, 2007 WL 2050409, at * 3 (N.D.W.Va. 2007)(citing Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir.1978)). Further, liberal construction

17

does not require the "courts to conjure up questions never squarely presented to them." <u>Beaudett v. City of Hampton</u>, 775 F.2d 1274, 1278 (4th Cir. 1985). In other words, a court may not construct legal argument for a plaintiff. <u>Small v. Endicott</u>, 998 F.2d 411 (7th Cir.1993). Finally, the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a claim currently cognizable in a federal district court. <u>Weller v. Department of Social Servs.</u>, 901 F.2d 387 (4th Cir.1990)). Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. <u>Denton v. Hernandez</u>, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992).

### **Summary Judgment**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. <u>Matsushita</u>, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. <u>Celotex</u>, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party

on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

## ANALYSIS

1. **PrimeCare Medical, Leonburg, and Hatfield's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment:**

   A. *Eighth Amendment Claim:*

In their Motion, Defendants PrimeCare, Leonburg, and Hatfield ["PrimeCare Defendants"] argue that "Plaintiff's allegations regarding his medical treatment do not meet the legal threshold for a viable civil rights claim under the 8th Amendment." (Document No. 65, pp. 3 – 6.) First, PrimeCare Defendants argue that Plaintiff cannot establish that he had a "serious medical need." (Id., p. 5.) PrimeCare Defendants argue that "documentation by PrimeCare personnel at the time of his incarceration show only abrasions and a red area on the back of his right knee." (Id.) PrimeCare Defendants further argue that Plaintiff admits that the dog bite did not puncture the skin. (Id.) PrimeCare Defendants further asserts that even if the dog bite punctured the skin, "failure to send [Plaintiff] to the hospital for a dog bite and some abrasions can hardly be considered deliberate indifference to a serious medical need." (Id.) Finally, PrimeCare Defendants dispute Plaintiff's alleged need for x-rays, an MRI, or a CT scan for his injuries. (Id.) In support, PrimeCare Defendants contend that "medical records from Wexford Health at Mt. Olive Correctional Center dated July 14, 2014, also note that there is 'no indication for skull x-ray based on physical assessment at this time." (Id.) PrimeCare Defendants conclude that "[t]his case is about nothing more than a disagreement between the Plaintiff and PrimeCare medical personnel over whether he should have been sent to a hospital for treatment of superficial injuries." (Id., p. 6.)

19

In Response, Plaintiff disputes that his allegations fail to state a viable Eighth Amendment claim. (Document Nos. 45 and 65.) Plaintiff contends that his allegations establish that he had serious injuries and PrimeCare Defendants knowingly and intentionally denied him necessary medical treatment because he was classified as an escapee. (Id.) Plaintiff further disputes PrimeCare Defendants' allegations that he only had abrasions from the dog bite and his car accident did not result in serious injuries. (Id.)

In Reply, PrimeCare Defendants continue to argue that Plaintiff did not have a serious injury that PrimeCare Defendants were deliberately indifferent. (Document No. 90, p. 1.) PrimeCare Defendants argue that the attached medical records clearly show that "Plaintiff had only abrasions on his head, left knee and the back of his right knee, as well as a canine bite to his buttocks, which did not break the skin." (Id.) Thus, PrimeCare Defendants conclude that none of the above injuries were serious injuries that would trigger an inquiry as to whether PrimeCare Defendants were deliberately indifferent. (Id.)

In Surreply, Plaintiff argues that PrimeCare Defendants acted with deliberate indifference because they conducted a "superficial examination" of his injuries. (Document No. 100.) In support, Plaintiff states that photographs and medical records from his intake screening at MOCC exhibit that Plaintiff had a puncture wound from the K-9 bite and knots on the front and back of his head from the high-speed automobile accident. (Id.)

Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811

(1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'")(quoting Hudson v. Palmer, 468 U.S. 517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). Sentenced prisoners are therefore constitutionally guaranteed adequate medical care under the Eighth Amendment.

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege and prove (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In Strickler, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth

Amendment.") A medical need serious enough to give rise to an Eighth Amendment claim involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. Id.; also see Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990)("A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."); Morales Felicciano v. Calderson Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004)("A constitutional violation is . . . established when government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medication attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort, or a threat to good health.") The Fourth Circuit stated the applicable standard in Miltier v. Beorn, 896 F.2d 848, 851 - 852 (4th Cir. 1990), as follows:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. * * * Deliberate indifference may be demonstrated by either actual intent or reckless disregard. * * * A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. * * * Nevertheless, mere negligence or malpractice does not violate the eighth amendment. (Citations omitted)

Miltier v. Born, 896 F.2d 848, 851 - 52 (4th Cir. 1990)(*recognized in* Sharpe v. South Carolina Dept. of Corr., 621 Fed.Appx. 732, 733 (4th Cir. 2015) *as overruled in part on other grounds by* Farmer, 511 U.S. at 837, 114 S.Ct. 1970); See also Sosebee v. Murphy, 797 F.2d 179, 183 (4th Cir. 1986)(Facts indicating that guards were aware that inmate's condition had worsened and was life-threatening and intentionally ignored the situation and refused to seek medical assistance provided

a reasonable basis for finding deliberate indifference to inmate's medical needs.); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978), cert. denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee's allegations of delay in treatment of his broken arm indicated a reasonable basis for inferring deliberate indifference to his serious medical needs.); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975)(Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical judgment not subject to judicial review.) Therefore, Plaintiff must first allege and eventually establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. See Farmer, *supra*, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, *supra*, 511 U.S. at 837, 114 S.Ct. at 1979. Plaintiff in this case must therefore allege and establish that each Defendant was aware that he was receiving constitutionally inadequate medical care and disregarded the serious physical consequences.

Plaintiff generally alleges that Defendants Hatfield and Leonburg acted with deliberate indifference in providing treatment for injuries he received from a high-speed car accident occurring prior to his arrest. For purposes of an Eighth Amendment claim, a medical need is serious if it involves a condition which places an inmate at substantial risk of serious harm, a condition for which lack of treatment causes continuous severe pain or significantly affects an individual's daily

23

life activities, or a condition diagnosed as mandating treatment or obviously requiring medical attention. Additionally, a medical need is "serious" if it "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." See Gaudreault, 923 F.2d at 208. Plaintiff alleges that his injuries caused continuous pain and suffering and the inability to "get up off the floor" without assistance from Defendants York and Leonburg. Accordingly, the undersigned will assume for purposes of this motion that Plaintiff's injuries were serious enough to give rise to an Eighth Amendment claim.

Even assuming Plaintiff alleges a sufficiently serious medical condition, there is no indication that Defendants Hatfield and Leonburg were deliberately indifferent to his condition. To satisfy the subjective component, Plaintiff must allege each Defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. Plaintiff contends that Defendants Hatfield and Leonburg acted with deliberate indifference in failing to transport Plaintiff to an outside hospital for evaluation and the performance of an MRI or CT scan. Plaintiff further states that Defendants acted with deliberate indifference by medically clearing Plaintiff for placement in general population prior to the performance of an x-ray that had been ordered by Defendant Leonburg. Drawing all inferences in a light most favorable to Plaintiff, the undisputed evidence reveals that Plaintiff arrived at WRJ at approximately 12:00 a.m. on July 12, 2015. Upon Plaintiff's arrival at WRJ, Defendant Hatfield performed Plaintiff's intake screening. Plaintiff advised Defendant Hatfield of his high-speed crash and showed her the K-9 puncture wounds[4] and other injuries to his body including abrasions and knots to his head. Defendant Hatfield noted abrasions to Plaintiff's head and left hip area, pain in the left knee, and red area on the back of the

---

[4] For purposes of the Motion, the undersigned will assume the K-9 bite caused a puncture wound.

24

right knee. Defendant Hatfield checked Plaintiff's vital, which were within the normal limits. Although Plaintiff requested transportation to the hospital for an MRI or CT scan, Defendants Hatfield and Leonburg denied his request. Defendant Leonburg advised Plaintiff that a mobile x-ray had been ordered and Plaintiff was placed in a holding cell. Plaintiff went to sleep while in the holding cell and was unable to get off the floor when he woke up. Defendants York and Leonburg "physically pick[ed] [Plaintiff] up off the floor and then moved [him] to holding cell 2, a single cell for observation." Plaintiff was held in the single holding cell until the evening hours, when either Defendant Hatfield or Leonburg medically cleared Plaintiff for placement in general population. Plaintiff was transferred to MOCC prior to the x-ray being conducted. The record reveals that Plaintiff was held at WRJ for approximately 40 hours,[5] where his medical treatment was overseen by Defendants PrimeCare Medical, Hatfield, and Leonburg. Upon his transfer to MOCC, Plaintiff's medical treatment was overseen by Wexford Health. The MOOC intake screening noted that Plaintiff had abrasions to his forehead and knees, abrasions and one puncture wound to his buttocks, and a nickel sized raise area on his head.

The Court finds that Defendants Hatfield and Leonburg did not act with deliberate indifference in providing medical treatment regarding Plaintiff's alleged injuries. As stated above, "[t]o establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851 – 52. In the instant case, the undisputed evidence reveals that Plaintiff's injuries were evaluated by Defendants

---

[5] Plaintiff was held at WRJ from 12:00 a.m. on July 12, 2015, until approximately 4:00 p.m. on July 13, 2015.

Hatfield and Leonburg and an x-ray was ordered. Although Plaintiff states that he received a "superficial examination" by Defendants Hatfield and Leonburg, this does not establish deliberate indifference.[6] When Defendant Leonburg became aware that Plaintiff was unable to get up off the floor, she moved Plaintiff to a single cell where he was observed for several hours. The undisputed evidence does not establish that Defendants Hatfield and Leonburg knowingly disregarded Plaintiff's need for evaluation or treatment during his brief confinement at WRJ. At most, Defendants Hatfield and Leonburg may have been negligent in failing to conduct a more thorough examination and ensuring that Plaintiff received an x-ray prior to his transfer to MOCC. It is well recognized, however, that "negligent medical diagnoses or treatment, without more, do not constitute deliberate indifference." Webb v. Hamidullah, 281 Fed.Appx. 159, 166 (4th Cir. 2008); also see Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir. 1986)("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). Plaintiff's deliberate indifference claim against Defendants Hatfield and Leonburg focuses upon their alleged "superficial examination" and refusal to arrange for Plaintiff's transfer to an outside hospital for an MRI or CT scan. An inmate's disagreement with his medical care or the course of treatment generally will not constitute a sufficient basis for a constitutional claim. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." Malcomb v. Raja, 2010 WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting Bowring v. Godwin,

---

[6] Plaintiff alleges that Defendants Hatfield and Leonburg conducted an insufficient examination because they failed to note the puncture wound to his buttocks and knots located on the front and back of his head. (Document No. 100, p. 2.)

551 F.2d 44, 47-48 (4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication over another does not give rise to a constitutional violation."); also see Estelle, 429 U.S. at 107, 97 S.Ct. at 285 ("A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment."). Plaintiff's simple disagreement with the appropriateness of the course of treatment provided by Defendants Hatfield and Leonburg does not establish the exceptional circumstances required for a finding of deliberate indifference. The undisputed evidence does not establish that Defendants Hatfield and Leonburg knowingly disregarded Plaintiff's need for evaluation or treatment during his brief confinement at WRJ. Although Plaintiff alleges that the delay of care provided by medical staff at WRJ and MOCC caused him to develop pneumonia that lead to empyema,[7] sepsis and a collapsed lung, the record does not support a finding that Defendants Hatfield and Leonburg ignore signs and symptoms of these conditions. Specifically, there is no allegation or indication that Plaintiff was experiencing such symptoms as shortness of breath, chest pain, or a fever during his brief confinement at WRJ. Based upon the undisputed facts, the undersigned finds that Defendants Hatfield and Leonburg did not act with deliberate indifference in providing medical treatment for Plaintiff's injuries. The undersigned finds it unnecessary to consider the other reasons which the Defendants Hatfield and Leonburg have submitted for dismissal regarding Plaintiff's Section 1983 claim.

    **B.**    ***Claims against PrimeCare:***

    In its Motion, PrimeCare argues that "[t]o the extent the Plaintiff's Complaint is based

---

[7] Empyema is "a condition in which pus gathers in the area between the lungs and the inner surface of the chest wall." (Document No. 142-3.)

upon a violation of his constitutional rights, PrimeCare Medical of West Virginia, Inc. is not a 'person' subject to suit under 42 U.S.C. § 1983. (Document Nos. 64 and 65.) Citing <u>Little v. Tygarts Valley Regional Jail</u>, 2013 WL 57447800 (N.D.W.Va. 2013)[8], PrimeCare argues that it is not a "person" for purpose of Section 1983 and is not a proper defendant in a case filed by an inmate. (Document No. 65, p. 13.) PrimeCare states that it has "no policy that an inmate should be taken to an outside physician simply because they request it." (<u>Id.</u>) PrimeCare argues that "Plaintiff's bald assertion that such a policy exists and was not followed is not sufficient to show a policy on custom of deliberate indifference on the part of PrimeCare." (<u>Id.</u>, pp. 13 – 14.) PrimeCare concludes that because it "is not a person subject to suit under 42 U.S.C. § 1983, and because the Plaintiff has not sufficiently pled any allegations against it involving policies or customs of deliberate indifference, all claims against it in this matter should be dismissed pursuant to Rule 12(b)(6)." (<u>Id.</u>, p. 14.)

In Response, Plaintiff argues that PrimeCare failed to comply with its policy on head trauma. (Document No. 85.) Specifically, Plaintiff states that PrimeCare has a policy on head trauma "that the inmate is supposed to be kept under observation for a period of up to 72 hours." (<u>Id.</u>) Plaintiff states that PrimeCare medical staff were clearly made aware that he suffered trauma to his head in a high-speed crash. (<u>Id.</u>)

In Reply, PrimeCare argues that it violated none of its policies and Plaintiff's "case is about nothing more than the Plaintiff's disagreement with the medical treatment he was provided." (Document No. 90, p. 2.)

---

[8] In *Little*, the Northern District dismissed PrimeCare after determining that PrimeCare was "not a 'person' for purposes of 42 U.S.C. § 1983, and there [were] no allegations against it involving policies or customs of deliberate inference."

28

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Title 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." Thus, Section 1983 provides a "broad remedy for violations of federally protected civil rights." Monell v. Dep't of Social Services, 436 U.S. 658, 685, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Generally speaking, to state and prevail upon a claim under 42 U.S.C. § 1983, a Plaintiff must prove that (1) a person acting under color of State law (2) committed an act which deprived him of an alleged right, privilege or immunity protected by the Constitution or laws of the United States. A private entity that contracts with the State to provide medical services acts "under color of state law." West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1998); also see Monell v. Dep't of Soc. Services, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)(A corporation acting under color of State law can be held liable under Section 1983 only for unconstitutional policies and practices.); Motto v. Correctional Medical Services, 2007 WL 2897854 (S.D.W.Va. Sept. 27, 2007). PrimeCare is a contracted medical provider of the West Virginia Regional Jail and Correctional Facility Authority, which provides health care services to inmates in West Virginia's regional jails. Since PrimeCare is a contracted medical provider for a state agency, the deliberate indifference standard is applicable to the conduct of PrimeCare and its employees. Mullins v. Prime Care Medical, Inc., 2014 WL 1260378, * 9 (S.D.W.Va. March 27, 2014)(J. Johnston); also see Edwards v. State, 2002 WL 34364404, * 12 (S.D.W.Va. March 29, 2002)(J. Goodwin)("To state a case against PrimeCare, [plaintiff] must show that a policy or custom or ratification of a policy or custom and procedure by PrimeCare caused a constitutional violation."); Kinder v. PrimeCare Medical, Inc., 2015 WL 1276748, *9 (S.D.W.Va. March 19, 2015). "[A] private corporation is liable under § 1983 *only* when the official

29

policy or custom of the corporation causes the alleged deprivation of federal rights." <u>Austin v. Paramount Parks, Inc.</u>, 195 F.3d 715, 728 (4th Cir. 1999)(emphasis in original). A private corporation, however, cannot be held liable under the doctrine of *respondeat superior* for the individual actions of its employees. <u>Id.</u> at 727; <u>see also</u> <u>Johnson v. Hamilton</u>, 452 F.3d 967, 973 (8th Cir. 2006). To succeed, Plaintiff must show that the official charged acted personally in the deprivation of plaintiff's rights.

Liberally construing Plaintiff's Complaint, Plaintiff appears to allege that PrimeCare acted with deliberate indifference by failing to comply with its own policies. As stated above, the Fourth Circuit has held that "[a] private corporation is liable under § 1983 . . . when an official policy or custom causes the alleged deprivation of federal rights." <u>Austin</u>, <u>supra</u>, 195 F.3d at 727. In the instant case, Plaintiff has not pled any allegations concerning such a policy or custom with regard to the conduct of PrimeCare. Instead, Plaintiff alleges that PrimeCare's failure to follow its own policies caused the deprivation of a federal right – not that PrimeCare's policies caused the deprivation of a federal rights. Plaintiff complains that PrimeCare acted with deliberate indifference by failing to comply with its policies (1) concerning observation of inmates with head trauma and (2) the transfer of inmates to outside hospitals for treatment. There is no allegation by Plaintiff that PrimeCare put the above policies in place with actual intent to cause harm or with reckless disregard of the risk of harm. To the extent Plaintiff is alleging that PrimeCare is responsible for its staff's failure to follow the above policies, Plaintiff argument fails. As stated above, a private corporation cannot be held liable under the doctrine of *respondeat superior* for the individual actions of its employees. <u>Austin</u>, <u>supra</u>, 195 F.3d at 727; <u>Johnson</u>, <u>supra</u>, 452 F.3d at 973. Based upon the foregoing, the undersigned respectfully recommends that PrimeCare's Motion be granted. The undersigned finds it unnecessary to consider the other reasons which the

PrimeCare has submitted for dismissal regarding Plaintiff's Section 1983 claim.

### C. *Medical Negligence:*

Finally, PrimeCare Defendants argue that to the extent Plaintiff is asserting a medical malpractice claim, such a claim should be dismissed because Plaintiff failed to comply with the prerequisites of the MPLA. (Document No. 64 and Document No. 65, pp. 8 – 11.) Plaintiff failed to address the foregoing in his Response. (Document No. 85.)

Under West Virginia law, a plaintiff must satisfy certain prerequisites prior to filing suit against a health care provider. Specifically, a plaintiff must serve each defendant health care provider with a notice of claim with an attached screening certificate of merit executed under oath by a health care provider qualified as an expert under the West Virginia Rules of Evidence at least thirty (30) days prior to filing suit. W. Va. Code § 55-7B-6. If a plaintiff has insufficient time to obtain a screening certificate of merit prior to the expiration of the applicable statute of limitations, the plaintiff must comply with the provisions of W. Va. Code § 55-7B-6(b) "except that the claimant or his or her counsel shall furnish the health care provider with a statement of intent to provide a screening certificate of merit within sixty days of the date the health care provider receives the notice of claim." W. Va. Code 55-7B-6(d). Compliance with West Virginia Code § 55-7B-6 is mandatory prior to filing suit in federal court. Stanley v. United States, 321 F.Supp.2d 805, 806-07 (N.D.W.Va. 2004); also see Starns v. United States, 923 F.2d 34 (4th Cir. 1991)(holding that Virginia's medical malpractice liability cap applies to claims brought against the United States under the FTCA). West Virginia Code § 55-7B-6(c), however, provides that no screening certificate of merit is necessary where "the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care." W. Va. Code § 55-7B-6(c). If a plaintiff proceeds under this

subsection, the Plaintiff must "file a statement specifically setting forth the basis of the alleged liability of the health care provider in lieu of a screening certificate of merit. Id.

First, the undersigned notes that Plaintiff's states in his Amended Complaint that he is not asserting a medical negligence claim against Defendants. (Document No. 50.) Specifically, Plaintiff states that "this Complaint is not a medical malpractice lawsuit, which requires the plaintiff to give (30) thirty days notice before filing the lawsuit." (Id., p. 1.) Plaintiff clarifies that he is alleging that Defendants violated his Eighth Amendment rights by failing to provide necessary and appropriate medical care. (Id.) Second, the Court notes that Plaintiff has filed no Response disputing that he failed to comply with the prerequisites of the MPLA. Additionally, there is no indication that Plaintiff has complied with the prerequisites of the MPLA. Finally, Plaintiff does not claim that he has filed a statement in lieu of a screening certificate of merit because his cause of action is based upon an well established legal theory of liability. To the extent Plaintiff is asserting a medical negligence claim the undersigned respectfully recommends that the PrimeCare Defendants' "Motion to Dismiss Amended Complaint and Alternative Motion for Summary Judgment" (Document No. 64) be granted.

**2.    PrimeCare Defendants' "Motion to Dismiss Complaint and Alternative Motion for Summary Judgment" (Document No. 29):**

Prior to the filing of Plaintiff's Amended Complaint, PrimeCare Defendants filed a "Motion to Dismiss Complaint and Alternative Motion for Summary Judgment" (Document No. 29) asserting similar grounds for dismissal as asserted in their subsequent "Motion to Dismiss Amended Complaint and Alternative Motion for Summary Judgment" (Document No. 64). Based upon the foregoing recommendation that PrimeCare Defendants' "Motion to Dismiss Amended Complaint and Alternative Motion for Summary Judgment" (Document No. 64) be granted, the

32

undersigned respectfully recommends that PrimeCare Defendants' "Motion to Dismiss Complaint and Alternative Motion for Summary Judgment" (Document No. 29) be denied as moot.

**3.      Defendant WVDOC's "Motion to Dismiss" (Document No. 91):**

In its Motion, Defendant WVDOC argues that it "is not a 'person' for purposes of 42 U.S.C. § 1983." (Document Nos. 91 and 93.) In Response, Plaintiff states that he concedes to WVDOC's Motion to Dismiss. (Document No. 139.) Specifically, Plaintiff acknowledges that "WVDOC is not a person." (Document No. 139.)

It is well recognized that a Section 1983 claim must be directed at a "person." See Preval v. Reno, 203 F.3d 821 (4th Cir. 2000)(unpublished)(finding that the Piedmont Regional Jail is not a "person" under Section 1983). In Will v. Michigan Dept. of State Police, the Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983". Will v. Michigan Dept. of State Police, 491 U.S. 58, 66, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989). The holding in Will applies not only to suits against the State, but also to suits against "public entities and political subdivisions" that are an "arm or alter ego" of the State. Maryland Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 260 (4th Cir. 2005)(citation omitted). It is well recognized that WVDOC is an arm of the State and is not a "person" within the meaning of Section 1983. See Rauch v. West Virginia Divison of Corrections, 2014 WL 3732123 (S.D.W.Va. July 25, 2014)(J. Copenhaver)(WVDOC is not a "person" for purpose of Section 1983); Berry v. Rubenstein, 2008 WL 1899907, * 2 (S.D.W.Va. April 25, 2008)(J. Faber)("WVDOC is an arm of the state and is therefore immune from suit under the Eleventh Amendment"); also see Lewis v. Western Regional Jail, 2012 WL 3670393, * 5 (S.D.W.Va. July 24, 2012)(finding that WRJ was not a "person" subject to suit under Section 1983); Webb v. Parsons, 2011 WL 2076419 (S.D.W.Va. May 6, 2011)(finding that the West Virginia Regional Jail Authority, an agency of the

State of West Virginia, is immune from suit under the Eleventh Amendment); Roach v. Burch, 825 F.Supp. 116, 117 (N.D.W.Va. 1993)(stating that the West Virginia Regional Jail Authority is not a "person" under Section 1983). Furthermore, pursuant to the Eleventh Amendment, the power of the federal judiciary does not extend to suits by a citizen against his or her own state. Hans v. Louisiana, 134 U.S. 1, 9, 10 S.Ct. 504, 33 L.Ed. 842 (1980); also see Will, supra, 491 U.S. at 66, 109 S.Ct. at 2309 (Suits against a state or state agencies for monetary damages are barred by the Eleventh Amendment to the United States Constitution); Kinder v. PrimeCare Med., Inc., 2015 WL 1276748, * 2 (S.D.W.Va. March 19, 2015)(dismissing WRJ based on Eleventh Amendment grounds). Accordingly, the undersigned finds that the WVDOC is not a proper defendant in the above action. It is therefore respectfully recommended that WVDOC's "Motion to Dismiss" (Document No. 91) be granted.

**4.      Defendant Ballard's "Motion to Dismiss for Failure to Serve" (Document No. 92):**

In his Motion, Defendant Ballard argues for dismissal based upon insufficient service of process. (Document Nos. 92 and 94.) Specifically, Defendant Ballard argues that the Summons and Complaint were accepted between September 22 – 26, 2017, by Rita McGuffin, an employee at MOCC. (Document No. 94, pp. 3 – 4.) Defendant Ballard contends that Ms. McGuffin was not authorized to accept service on his behalf and that his employment with MOCC ended on or about September 19, 2017, prior to the attempted service. (Id.) Accordingly, Defendant Ballard asserts that Plaintiff's Amended Complaint against him must be dismissed for insufficient service of process.

During a status conference conducted on December 7, 2017, the undersigned addressed the above issue of insufficient service of process as to Defendant Ballard. The undersigned noted that Plaintiff is proceeding *in forma pauperis* and is entitled to rely on the Court for assistance regarding

34

service of process. See 28 U.S.C. § 1915(d)("[O]fficers of the court shall issue and serve all process and perform all duties in such cases."); Skaggs v. Clark, 2015 WL 269154, * 3 (S.D.W.Va. Jan. 21, 2015)(J. Chambers)("[P]laintiffs bear the reasonable burden of identifying some address where service can be properly made.") The Court found that Plaintiff had meet his burden of identifying the address where service could be properly made upon Defendant Ballard, but the address was no longer valid due to Defendant Ballard's recent change of employment. The undersigned then directed Defendant Ballard's counsel to disclose to the Court, *in camera*, the home address of Defendant Ballard or, in the alternative, file a waiver of service. (Document No. 130.) A waiver of service was filed on behalf of Defendant Ballard on December 12, 2017. (Document No. 135.) On December 18, 2017, Plaintiff filed his Response in Opposition to Defendant Ballard's Motion to Dismiss stating that Defendant Ballard has now "been properly served." (Document No. 140.)

As stated above, a waiver of service has now been filed on behalf of Defendant Ballard. (Document No. 135.) Accordingly, the undersigned respectfully recommends that Defendant Ballard's "Motion to Dismiss for Failure to Serve" (Document No. 92) be denied as moot.

**5.    Defendants Dr. Charles Lye, Donna Warden, Wexford Health Sources Inc.'s "Motion to Dismiss" (Document No. 95):**

### A.    *Failure to Exhaust:*

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)(1996), requires that inmates exhaust available administrative remedies prior to filing civil actions though the administrative process may not afford them the relief they might obtain through civil proceedings.[9] Woodford v.

---

[9] 42 U.S.C. § 1997e(a) provides as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title or any other federal law, by a prisoner confined in any jail, prison, or other correction facility until such administrative remedies as are available

Ngo, 548 U.S. 81, 126 S.Ct. 2378, 2382-83, 165 L.Ed.2d 368 (2006); Porter v. Nussle, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)(The Prison Litigation Reform Act's exhaustion requirement applies to all inmate suits about prison life whether they involve general circumstances or particular episodes and whether they allege excessive force or some other wrong.); Booth v. Churner, 532 U.S. 731, 121 S.Ct. 1819, 1820,149 L.Ed.2d 958 (2001)("Under 42 U.S.C. § 1997e(a), an inmate seeking only money damages must complete any prison administrative process capable of addressing the inmate's complaint and providing some form of relief, even if the process does not make specific provision for monetary relief."). Exhaustion of administrative remedies is also required when injunctive relief is requested. Goist v. U.S. Bureau of Prisons, 2002 WL 32079467, *4, fn.1 (D.S.C. Sep 25, 2002), aff'd, 54 Fed.Appx. 159 (4th Cir. 2003), cert. denied, 538 U.S. 1047, 123 S.Ct. 2111, 155 L.Ed.2d 1088 (2003). "[A] court may not excuse a failure to exhaust" because the PLRA's mandatory exhaustion scheme "foreclose[es] judicial discretion." Ross v. Blake, ___ U.S. ___, 136 S.Ct. 1850, 1856-57, 195 L.Ed.2d 117 (2016)("[A] court may not excuse a failure to exhaust, even to take [special circumstances] into account."). But the plain language of the statute requires that only "available" administrative remedies be exhausted. Id. at 1855("A prisoner need not exhaust remedies if they are not 'available.'") In Ross v. Blake, the Supreme Court set forth three scenarios where the administrative process is considered "unavailable": (1) The administrative process "operates as a simple dead end -- with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) The administrative process is so opaque that no ordinary prisoner can discern or navigate through the process; and (3) The "administrator thwart inmates from taking advantage of

---

are exhausted.

a grievance process through machination, misrepresentation or intimidation." Ross, 136 S.Ct. at 1859-60; also see Dale v. Lappin, 376 F.3d 652, 656 (7th Cir. 2004); Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003)(inmate lacked available administrative remedies for exhaustion purposes where inmate was unable to file a grievance because prison officials refused to provide him with the necessary grievance forms); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001)(allegations that prison officials failed to respond to his written requests for grievance forms were sufficient to raise an inference that inmate had exhausted his available administrative remedies.)

        If an inmate exhausts administrative remedies with respect to some, but not all, of the claims he raises in a Section 1983, Bivens or FTCA action, the Court must dismiss the unexhausted claims and proceed with the exhausted ones. See Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 913, 166 L.Ed.2d 798 (2007)("The PLRA does not require dismissal of the entire complaint when a prisoner has failed to exhaust some, but not all, of the claims included in the complaint. * * * If a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad.") It appears to be the majority view as well that exhausting administrative remedies after a Complaint is filed will not save a case from dismissal. See Neal v. Goord, 267 F.3d 116, 121-22 (2d Cir. 2001)(overruled on other grounds), a Section 1983 action, citing numerous cases. The rationale is pragmatic. As the Court stated in Neal, allowing prisoner suits to proceed, so long as the inmate eventually fulfills the exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court. Moreover, if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court would have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset. Neal, 267 F.3d at 123. In Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999), the Court stated: "The plain language of the statute [§ 1997e(a)]

37

makes exhaustion a precondition to filing an action in federal Court.. . .The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." Thus, the PLRA requires that available administrative remedies must be exhausted before the filing of a suit in Federal Court. It is further clear that the PLRA does not require that an inmate allege or demonstrate that he has exhausted his administrative remedies. See Jones v. Bock, supra; Anderson v. XYZ Correctional Health Services, 407 F.3d 674, 677 (4th Cir. 2005), *abrogated on other grounds by* Custis v. Davis, 851 F.3d 358 (4th Cir. 2017). Failure to exhaust administrative remedies is an affirmative defense. Prison officials have the burden of proving that the inmate had available remedies which he did not exhaust. Jones v. Bock, supra, 549 U.S. at 216, 127 S.Ct. at 921(Failure to exhaust is an affirmative defense that a defendant must generally plead and prove); also see Dale v. Lappin, 376 F.3d 652, 655 (7th Cir. 2004)("Although exhaustion of administrative remedies is a precondition to a federal prisoner filing a Bivens suit, [citations omitted] failure to exhaust is an affirmative defense that the defendants have the burden of pleading and proving." (Citations omitted)) The Court is not precluded, however, from considering at the outset whether an inmate has exhausted administrative remedies. "A court may sua sponte dismiss a complaint when the alleged facts in the complaint, taken as true, prove that the inmate failed to exhaust his administrative remedies." Custis v. Davis, 851 F.3d. 358, 361 (4th Cir. 2017); also see Banks v. Marquez, 694 Fed. Appx. 159 (4th Cir. 2017)(finding no error in the district court's decision to sua sponte dismiss petitioner's petition where petitioner explicitly admitted in his petition that he failed to exhaust his administrative remedies).

The West Virginia Division of Corrections' Policy Directive 335.00 establishes procedures whereby state inmates may seek review of complaints which relate to any aspect of their imprisonment. Within 15 days after the circumstances occurred which are the subject of the

inmate's complaints, the inmate must submit a G-1 Grievance Form to the Unit Manager. The Unit Manager must respond to the inmate's Grievance within five business days. If the inmate receives no response or the Unit Manager's response is unfavorable, the inmate may appeal within five working days to the Warden/Administrator by filing a G-2 Grievance Form. The Warden/Administrator must respond to the appeal, in writing, within five working days. If the Warden/Administrator, in his/her discretion, determines that an investigation is warranted, a final response shall be made to the inmate within 30 working days. If the Warden/Administrator's response is unfavorable, the inmate may appeal within five working days to the Commissioner/designee of the Division of Corrections. The Commissioner must respond to the appeal within ten working days. The administrative process is exhausted when the Commissioner responds to the inmate's final appeal. The entire process takes about 60 days to complete. If prison officials fail to timely answer the grievance, the inmate may treat the non-response as a denial and proceed to the next level of review.

Wexford Defendants have filed a Motion requesting dismissal of Plaintiff's Section 1983 claim based upon Plaintiff's failure to exhaust. (Document Nos. 95 and 96, pp. 5 – 7.) Specifically, Wexford Defendants argue that even though Plaintiff has filed "seven grievance with respect to his medical care, none of the grievances filed related to claims against Donna Warden and none involve any claims arising out of his diagnosis of pneumonia and his surgery as well as the damages claimed thereafter." (Id., p. 5.) Wexford Defendants explain that none of Plaintiff's grievances relate to "any claims arising out of Dr. Lye's treatment of his pneumonia or alleged failure to treat his pneumonia." (Id., p. 7.) Wexford Defendants further state that Plaintiff filed "no grievances against Ms. Warden for the allegations set forth in the Complaint against her concerning her role in responding to Mr. Langley's grievances." (Id.) Finally, Wexford Defendants note that

39

"Plaintiff has failed to set forth any reason to excuse the failure to exhaust."[10] (Id.)

In his Response in Opposition, Plaintiff argues that he "did exhaust his administrative remedies." (Document No. 99.) Plaintiff states that he "wrote the Commissioner's Office and they never replied, so the Plaintiff had to use G-1 Responses and numbers." (Id.) Plaintiff further states that he is a layperson with no medical knowledge. (Id.) Plaintiff, therefore, argues that he adequately exhausted his inadequate medical treatment claim by "asking for help, going as far as saying 'He's in fear for his life under Dr. Lye's care." (Id.) Plaintiff further states that the grievance process is futile because the Unit Supervisor and the Warden/Administrator have a practice of never conducting an investigation and denying almost all grievances. (Id., p. 3.) As to appealing to the Commissioner of the Division of Corrections, Plaintiff argues that his office "will not respond to letters mailed to them asking for the final copy of the grievances; all of which are literally rubber stamped denied." (Id.)

Since Plaintiff submitted copies of his grievances (Document No. 89) in support of his Complaint, Wexford Defendants argue that it is apparent from the face of Plaintiff's Complaint and Amended Complaint that he failed to fully exhaust his administrative remedies. A review of Plaintiff's Exhibits reveals that Plaintiff filed grievances complaining of the lack of necessary medical care concerning injuries he received in the automobile accident. Furthermore, Wexford Defendants do not dispute that Plaintiff exhausted his claim that he was denied necessary medical care concerning injuries he received in the automobile accident.[11] Wexford Defendants, however,

---

[10] The undersigned notes that failure to exhaust is an affirmative defense. Prison officials have the burden of proving that the inmate had available remedies which he did not exhaust. In his Complaint, Plaintiff was *not* required to "set forth any reason to excuse the failure to exhaust."

[11] Defendants have failed to provide the Court with any affidavits or documentation showing that Plaintiff failed to exhaust his administrative remedies as to medical treatment of his injuries from

argue that Plaintiff failed to exhaust his specific claim regarding his development of pneumonia and empyema. In his Complaint and Amended Complaint, Plaintiff alleges that Defendant Lye's continued failure to provide necessary medical care of the injuries Plaintiff's sustained in the high-speed accident caused Plaintiff to develop pneumonia that lead to empyema,[12] severe sepsis, and a collapsed lung. Plaintiff further alleges that Defendant Warden was aware of the inadequate medical treatment, but took no action to ensure that Plaintiff's received necessary care. Although Plaintiff did not file a grievance specifically complaining of inappropriate medical care concerning his development of pneumonia, empyema, sepsis, and a collapsed lung, Plaintiff did file grievances concerning his claim that he was receiving inadequate medical care for injuries sustained in the high-speed automobile accident. "[T]o satisfy the exhaustion requirement, grievances generally need only be sufficient to 'alert[ ] the prison to the nature of the wrong for which redress is sought.'" Wilcox v. Brown, 877 F.3d 161, 170, fn. 4 (4th Cir. Dec. 5, 2017)(citing Strong v. Davis, 297 F.3d 646, 650 (7th Cir. 2002)). The Fourth Circuit has stated that "prisoners need not file multiple, successive grievance raising the same issue (such as prison conditions or policies) if the objectionable condition is continuing." Id. (citing Turley v. Rednour, 729 F.3d 645, 650 (7th Cir. 2013)). "[O]nce a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement." Id.

The undersigned finds that Plaintiff's filing of grievances alleging improper treatment of injuries sustained in his automobile accident provided the prison with adequate notice, and the

---

the automobile accident.

[12] In Response, Plaintiff attached a medical article concerning empyema. Citing the medical article, Plaintiff argues that the trauma from his car accident and the lack of necessary medical care lead to his development of pneumonia, empyema, severe sepsis, and a collapsed lung. (Document No. 142-3.)

opportunity to correct, Plaintiff's alleged problem of receiving inadequate medical treatment of those injuries leading to the development of pneumonia, empyema, sepsis, and a collapsed lung. Therefore, the undersigned finds that Plaintiff was not required to file a grievance specifically alleging that Dr. Lye's continuous failure to provide necessary treatment of his injuries, and Defendant Warden's failure to investigate his grievances, lead to the development of pneumonia, empyema, sepsis, and a collapsed lung. Furthermore, Plaintiff appears to argue that he exhausted all "available" administrative remedies because (1) the Unit Supervisor and the Warden/Administrator have a practice of never conducting an investigation and denying almost all grievances, and (2) the Commissioner of the Division of Corrections "will not respond to letters mailed to them asking for the final copy of the grievances; all of which are literally rubber stamped denied." (Id.) In Ross, the Fourth Circuit explained administrative remedies may be deemed "unavailable" when the administrative process "operates as a simple dead end -- with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Ross, 136 S.Ct. at 1859-60. Accordingly, the undersigned finds that it is not apparent from the face of the Complaint that Plaintiff failed to exhaust his available administrative remedies. See Custis, 851 F.3d, 361-62(stating that it is a rare instance where failure to exhaust is apparent on the face of the complaint). To the extent Wexford Defendants request dismissal for failure to exhaust, the undersigned respectfully recommends that the District Court deny their "Motion to Dismiss" (Document No. 95).

### B.    *Wexford Health Sources:*

In its Motion, Wexford argues that it is not a "person" for the purposes of 42 U.S.C. § 1983. (Document No. 95 and Document No. 96, pp. 7 – 8.) In support, Wexford states that there are no allegations against it other than Plaintiff's complaint that Wexford "did not want Mr. Langley to

be seen by an outside specialist because it wanted to cover up Dr. Lye's mistreatment or that it had

a policy of saving money." (Document No. 96, p. 7.) Wexford argues that Plaintiff cannot hold it

liable under the theory of *respondeat superior* as the employer of Dr. Lye and the other medical

staff at the facility. (Id.) Wexford further claims that there are no allegations against it involving

policies or customs of deliberate indifference. (Id.) Wexford explains that "every business has a

policy of saving money, as does the DOC, and as probably does Mr. Langley when he has the

opportunity to save money." (Id., p. 8.) Thus, Wexford concludes that "[s]aving money is not a

policy or custom of deliberate indifference." (Id.)

In Response, Plaintiff explains that he is a layperson and acknowledges that Wexford is

not a "person." (Document No. 99, p. 3.)

As stated above, a private entity that contracts with the State to provide medical services

acts "under color of state law." West, supra, 487 U.S. at 42, 108 S.Ct. at 2250; also see Monell,

supra, 436 U.S. at 690, 98 S.Ct. at 2018. Wexford Health Sources is a contracted medical provider

of the West Virginia Regional Jail and Correctional Facility Authority, which provides health care

services to State inmates. Since Wexford is a contracted medical provider for a state agency, the

deliberate indifference standard is applicable to the conduct of Wexford and its employees. Lynch

v. Wexford Health Sources, 2016 WL 2944688, * 5 – 6 (S.D.W.Va. May 20, 2016)(J. Johnston);

Ojeda v. Procter, 2011 WL 240447, * 1 (N.D.W.Va. Jan. 4, 2011); also see Edwards, supra, 2002

WL 34364404 at * 12("To state a case against PrimeCare, [plaintiff] must show that a policy or

custom or ratification of a policy or custom and procedure by PrimeCare caused a constitutional

violation."). "[A] private corporation is liable under § 1983 *only* when the official policy or custom

of the corporation causes the alleged deprivation of federal rights." Austin, supra, 195 F.3d at 728.

Specifically, liability will attach to such a private corporation "only for those policies or customs

having a '*specific* deficiency or deficiencies . . . such as to make the *specific* violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run." Carter v. Morris, 164 F.3d 215, 218 *4th Cir. 1999)(quoting Spell v. McDaniel, 824 F.2d 1380, 1390 (4th Cir. 1987)). A private corporation, however, cannot be held liable under the doctrine of *respondeat superior* for the individual actions of its employees. Austin, supra, 195 F.3d at 727. To succeed, Plaintiff must show that the official charged acted personally in the deprivation of plaintiff's rights.

Liberally construing Plaintiff's Complaint, Plaintiff appears to allege that Wexford maintained an official custom or policy with respect to providing medical care that manifested deliberate indifference to Plaintiff's serious medical needs. Specifically, Plaintiff alleges that Wexford's policy or custom of saving money while providing medical care resulted in deliberate indifference to Plaintiff's serious medical needs. Plaintiff alleges that despite his continuous complaints and requests for adequate medical care, Wexford continued to refuse to provide adequate medical care to Plaintiff to further its policy or custom of saving money. See Lynch, supra, 2016 WL 2944688 at * 9(stating that "in order to proceed against Wexford, Plaintiff must allege that Wexford maintained an official custom or policy with respect to providing medical care that manifested deliberate indifference to Plaintiff's serious medical needs"); Newbrough v. Piedmont Regional Jail, 822 F.Supp.2d 558, 581 (E.D.Va. 2011)(finding that an entity defendant could be liable "for maintaining a municipal custom of constitutionally deficient care that caused [plaintiff's] injury"). Thus, Plaintiff's allegations do not merely seek to hold Wexford vicariously liable for the actions of Defendant Lye or other medical employees. At this stage, the undersigned finds that Plaintiff has alleged a plausible claim of deliberate indifference against Wexford. To the extent Wexford argues that it is not a "person" for the purposes of 42 U.S.C. § 1983, the undersigned respectfully recommends that Wexford's Motion to Dismiss (Document No. 95) be

denied.

### C.    *Defendant Donna Warden:*

In her Motion, Defendant Warden argues that there are no direct claims against her that would establish a claim of deliberate indifference. (Document No. 95 and Document No. 96, pp. 8 – 9.) Specifically, Defendant Warden notes that "[t]here are no allegations in the Complaint that [she] provided any medical care or did not provide any medical care to the Plaintiff." (Document No. 96, p. 8.) Defendant Warden states that she is named as a defendant only "because of her capacity as the Health Service Administrator in responding to the grievance and not for the provision of any medical care, adequate or inadequate." (Id.) Defendant Warden argues that to establish personal liability in a Section 1983 action, a defendant "must be personally involved in the alleged wrong and liability cannot be predicated solely upon *respondeat superior*." (Id.) Therefore, Defendant Warden argues that she must be dismissed because there are no specific allegations against her. (Id., p. 9.)

In Response, Plaintiff argues that he has properly alleged a deliberate indifference claim against Defendant Warden. (Document No. 99.) Plaintiff alleges that Defendant Warden acted with deliberate indifference when answering or responding to his grievances. (Id.) Plaintiff explains that although he filed grievances with Defendant Warden complaining of inadequate medical care, Defendant Warden responded to the grievances without conducting any investigation concerning Plaintiff's medical care. (Id.)

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. * * * Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the officials own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556

45

U.S. 662, 676, 129 S.Ct. 1936, 1948, 173 L.Ed.2d 868 (2009); see also Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001), cert. denied, 537 U.S. 1045 , 123 S.Ct. 621, 154 L.Ed.2d 517 (2002)("In a Bivens suit there is no respondeat superior liability. * * * Instead, liability is personal, based upon each defendant's own constitutional violations." (Citation omitted.)); Monell, supra, 436 U.S. at 694, 98 S.Ct. at 2018("the mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability"). Liability can be premised, however, "on a recognition that supervisory indifference or 'tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984), cert. denied, 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). To establish liability under Section 1983 for a supervisory defendant, the plaintiff must establish the following:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). Thus, a plaintiff must show "a pervasive and unreasonable risk of harm from some specified source and that the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'" Slakan, 737 F.2d at 373. Evidence of a supervisor's continued inaction in the face of documented widespread abuses provides an independent basis for finding she either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of her subordinates. Id. A supervisor's mere knowledge of a subordinate's unconstitutional conduct is not enough. Rather, Section 1983 liability may be imposed upon a supervisor only on the basis of purposeful "violations of his or

her supervisory responsibilities." <u>Ashcroft</u>, 556 U.S. at 676, 129 S.Ct. at 1949. Thus, the inquiry for the Court is whether the Defendant individually "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm." <u>Moore v. Winebrenner</u>, 927 F.2d 1312, 1315 (4th Cir. 1991).

Liberally construing Plaintiff's Complaint, Plaintiff adequately alleges that Defendant Warden had knowledge that Dr. Lye was withholding necessary medical care that posed a unreasonable risk of injury to Plaintiff, Defendant Warden's response was so inadequate as to show deliberate indifference or tacit authorization of the lack of necessary medical care, and there was a link between Defendant Warden's inaction and the injury suffered by Plaintiff. Taking Plaintiff's factual allegations as true, Defendant Warden was made aware of Plaintiff's serious medical needs by the filing of multiple grievances. <u>See</u> <u>Freeland v. Ballard</u>, 2017 WL 337997, * 9 (S.D.W.Va. Jan. 23, 2017)(J. Johnston)(finding that the filing of grievances puts supervisors on notice of information contained within the grievance). Despite this awareness, Defendant Warden continuously failed to investigate by reviewing Plaintiff's medical records or offering any type of assistance to remedy the alleged lack of necessary medical care. Thus, Plaintiff alleges that Defendant Warden's response to the above knowledge was so inadequate as to constitute deliberate indifference or tacit authorization of the lack of necessary medical care. Finally, Plaintiff alleges that had Defendant Warden properly investigated or considered his claims, Plaintiff would have been provided with necessary medical care prior to his development of pneumonia, empyema, sepsis, and a collapsed lung. The undersigned, therefore, finds that the foregoing allegations are not based upon vicarious liability. <u>See</u> <u>Lynch</u>, <u>supra</u>, 2016 WL 2944688 at * 9(finding sufficient allegations of deliberate indifference where plaintiff alleged the Health Services Administrator

47

was made aware of plaintiff's serious medical needs through multiple grievance, but the Administrator failed to review plaintiff's medical file or offer any assistances). To the extent Defendant Warden requests dismissal based upon the above, the undersigned respectfully recommends that Wexford Defendants' "Motion to Dismiss" (Document No. 95) be denied.

### D. Deliberate Indifference by Wexford Defendants:

In their Motion, Wexford Defendants argue that Plaintiff fails to allege sufficient facts, which if proven, could support a claim for violation of the Plaintiff's Eighth Amendment Rights by virtue of deliberate indifference on the part of said Defendants to any serious medical condition of Plaintiff." (Document No. 95 and Document No. 96, pp. 9 – 13.) Wexford Defendants argue that Plaintiff's allegations "make it clear that Mr. Langley's injuries from his car accident was not ignored by the medical staff at any facility where he was incarcerated." (Document No. 96, p. 9.) Wexford Defendants state that Plaintiff "repeatedly filed medical requests, was repeatedly seen by medical staff, including Dr. Lye, and repeatedly complained about the care and treatment he was receiving." (Id., p. 10.) Wexford Defendants further argue that they were not deliberate indifferent to Plaintiff's pneumonia. (Id.) Wexford Defendants, however, contend that Plaintiff's allegations only indicate a disagreement with the medical care provided to him. (Id., pp. 12 - 13.)

In his Response in Opposition, Plaintiff argues that the continuous denial of necessary treatment for the injuries he suffered in the car accident lead to his development of pneumonia, empyema, sepsis, and a collapsed lung. (Document No. 99.) Plaintiff alleges that Defendants showed a continuous pattern denying him necessary medical care despite his continuous complaints. (Id., pp. 2 – 3.)

Accepting Plaintiff's factual allegations as true, Plaintiff has plead facts that allows the

court to draw the reasonable inference that the defendants were deliberate indifferent to his serious medical needs. Plaintiff alleges that he suffered injuries in a high-speed automobile accident and Wexford Defendants continuously failed to provide necessary treatment leading to his development of pneumonia, empyema, sepsis, and a collapsed lung. Plaintiff alleges that he was transported to MOCC on July 13, 2015, where his medical care was provided by Wexford. Plaintiff alleges that the during the intake screening, the nurse noted Plaintiff's "head trauma, bumps, knots, scrapes, and a dog bite puncture wound to my left buttock." (Id.) Plaintiff claims that he informed the intake nurse of his automobile accident and she placed Plaintiff on the list to be evaluated by Defendant Lye. Plaintiff contends that from July 13, 2015 through November 1, 2015, he filed 13 sick call requests complaining of "loss of motor skills in hands, severe muscle cramps in back, loss of breath, fever, not being able to breathe, and telling the provider I was in a serious car wreck that I needed to go to an outside doctor for an MRI or CT scan." Despite advising medical staff that "something was affecting [him] severely, Plaintiff alleges that Defendant Lye performed only a "few superficial examination" and "mainly just protocoled Motrin and stated [Plaintiff] was ok." Although Plaintiff acknowledges that Defendant Lye ordered an x-ray on September 24, 2015, Plaintiff states that the x-ray was delayed until October 21, 2015. Plaintiff alleges that even though Defendant Lye and other medical staff were aware that his health was continuing to deteriorate due to the lack of necessary medical care, Defendant Lye continued to deny Plaintiff medical care. Plaintiff explains that on October 6 and 7, 2015, Correctional Officers and Nurses Michelle and April had to come into his cell five times to help Plaintiff get out of bed and two times to help him out of the floor. Plaintiff claims that Defendant Lye was on the premises on October 7, 2015 and was aware of the foregoing, but refused to see Plaintiff until the next day. Plaintiff alleges that on

October 8, 2015, Defendant Lye deliberately ignored Plaintiff's signs and symptoms exhibiting a need for medical care by performing a brief, one-minute examination and declaring Plaintiff to be in good health. Plaintiff alleges that approximately two weeks later he was placed in the MOCC infirmary and started on antibiotics because the x-ray (that had been delayed for nearly a month) exhibited that Plaintiff had double pneumonia. Although the radiologist report from CAMC Memorial Hospital dated October 21, 2015 recommended that Plaintiff be transported to the hospital for a CT scan, Plaintiff alleges that Defendant Lye and Wexford ignored this recommendation "to save as much money as possible" and "to cover the blatant medical neglect that had allowed [Plaintiff] to become so sick." Plaintiff claims that he was kept in the MOCC infirmary "being pumped full of excessive doses of antibiotics and steroids for 10 more days until . . . staff was unable to get an EKG reading and had [Plaintiff] transferred to CAMC Memorial Hospital on November 1, 2015." Plaintiff contends that a CT scan was immediately conducted upon his arrival at CAMC and Plaintiff was rushed into surgery to have a complete thoracotomy of his left lung. Plaintiff states that Defendant Lye's deliberate denial and delaying of medical care caused Plaintiff to develop double pneumonia, empyema, severe sepsis, and a collapsed lung.

Accepting Plaintiff's foregoing allegations as true, the undersigned finds that Plaintiff has sufficiently alleged a serious medical need. Specifically, Plaintiff alleges that on several occasions his condition rendered him unable to get out of bed without assistances. Accepting Plaintiff's allegations as true, Plaintiff describes a serious condition so obvious that even a layperson would recognize the necessity for medical attention. See Gaudreault, 923 F.2d at 208. Second, the undersigned finds that Plaintiff has adequately alleged that Wexford Defendants knew of and disregarded an excessive risk to Plaintiff's health and safety. Specifically, Plaintiff alleges that

Defendant Lye was aware of facts from which an inference can be drawn that a substantial risk of serious harm to Plaintiff existed and Defendant Lye disregarded such. See Lynch, 2016 WL 2944688, * at 7("Where the evidence demonstrates that an official merely refused to verify underlying facts that he strongly suspected to be true, which, if verified, would have compelled him to realize that the claimant needed immediate medical attention, or that he declined to confirm inference of risk that he strongly suspected to exist, that official can be held liable notwithstanding his actual ignorance of the medical need at issue.")(internal quotations and citations omitted). Specifically, Plaintiff states that Defendant Lye was aware of, and disregarded, Plaintiff's complaints of loss of motor skills in hands, severe muscle cramps in his back, shortness of breath, a fever, and the radiologist's recommendation of a CT scan. Approximately two weeks after Defendant Lye conducted a brief examination declaring Plaintiff to be in good health, an x-ray revealed Plaintiff had double pneumonia and Plaintiff required emergency surgery ten days later. See Jehovah v. Clarke, 798 F.3d 169, 181-82 (4th Cir. 2015)(finding plaintiff stated a claim where he alleged "his doctors acknowledged some symptoms but ignored most, disregarded abnormal test results, and failed to treat any of his symptoms effectively"). Although an inmate's mere disagreement with medical care is insufficient to state a claim, Plaintiff does not have to allege a total failure to provide medical treatment. Id. Thus, Plaintiff's mere acknowledgment that he received some medical care does not defeat his claim of deliberate indifference. See De'Lonta v. Johnson, 708 F.3d 520, 526 (4th Cir. 2013)(rejecting the argument that "just because [defendants] have provided [plaintiff] with some treatment . . . it does not follow that they have necessarily provided her with constitutionally adequate treatment"). Plaintiff alleges that the continuous denial of necessary treatment and diagnostic testing concerning his back and chest injuries incurred in

the automobile accident, lead to Plaintiff's development of pneumonia, empyema, severe sepsis, and a collapsed lung. The foregoing raises an inference that necessary medical treatment was not provided. <u>See</u> <u>King v. United States</u>, 536 Fed.Appx. 358 (4th Cir. 2013)(The deliberate indifference standard "can be satisfied 'when the need for treatment is obvious' yet prison officials merely provide 'medical care which is so cursory as to amount to no treatment at all.'")(citation omitted). Based on the foregoing, the undersigned respectfully recommends that Wexford Defendant's "Motion to Dismiss" (Document No. 95) be denied.

**6.    Plaintiff's "Motion for Summary Judgment" (Document No. 76):**

In his Motion for Summary Judgment, Plaintiff requests summary judgment against Defendant HPD and the arresting officer. (<u>Id.</u>) In support, Plaintiff concludes that he is entitled to summary judgment because he has "submitted facts and case law supporting those facts" showing deliberate indifference by Defendant HPD and the arresting officer. (<u>Id.</u>) Plaintiff appears to argue that he is entitled to summary judgment because he "had multiple injuries and asked to be taken to the hospital, [and] that request was denied because the Plaintiff was listed as an escapee." (<u>Id.</u>) Next, Plaintiff appears to argue he is entitled to summary judgment because "Huntington Police Department and the arresting officer have now refused two orders to comply from United States Magistrate Judge Eifert (Document No. 25) and Honorable Judge Omar J. Aboulhosn (Document No. 49)." (<u>Id.</u>)

The undersigned finds that Plaintiff's above Motion for Summary Judgment against HPD and the arresting officer (Defendant Marshall) should be denied. First, the record clearly reveals that Plaintiff filed his above Motion prior to obtaining proper service of HPD or Defendant Marshall. (Document Nos. 130, 132, and 136.) Additionally, the mere fact that Defendant HPD

had not responded to the Court's order regarding the identification of the arresting officer does not entitled Plaintiff to summary judgment.[13] The undersigned, therefore, respectfully recommends that Plaintiff's Motion for Summary Judgment (Document No. 76) be denied.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **GRANT** Defendants PrimeCare Medical, Inc., Nurse Jalayna Leonburg, and Jennifer Hatfield's "Motion to Dismiss Amended Complaint and Alternative Motion for Summary Judgment" (Document No. 64), **DENY as moot** Defendants PrimeCare Medical, Inc. and Nurse Jalayna Leonburg's "Motion to Dismiss Complaint and Alternative Motion for Summary Judgment" (Document No. 29), **DENY** Plaintiff's "Motion for Summary Judgment" (Document No. 76), **GRANT** Defendant West Virginia Department of Corrections' "Motion to Dismiss" (Document No. 91), **DENY as moot** Defendant David Ballard's "Motion to Dismiss for Failure to Serve" (Document No. 92), **DENY** Defendants Dr. Charles Lye, Donna Warden, Wexford Health Sources Inc.'s "Motion to Dismiss" (Document No. 95), and refer this matter back to the undersigned for further proceedings.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Robert C. Chambers. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this

---

[13] The City Attorney for Huntington, Scott A. Damron, responded to the Court's Orders on November 13, 2017. (Document No. 104.)

Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Chambers and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: January 9, 2018.

Omar J. Aboulhosn
United States Magistrate Judge