# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

# HUNTINGTON DIVISION

JAMES ALBERT LANGLEY,

        Plaintiff,

v.        CIVIL ACTION NO. 3:17-3520

ARRESTING OFFICERS;
DR. CHARLES LYE;
DONNA WARDEN; and
WEXFORD HEALTH SOURCES INC.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants Wexford Health Sources, Inc. (Wexford), Charles Lye, M.D., and Donna Warden's Motion for Summary Judgment. ECF No. 226. For the following reasons, the Court **GRANTS** the motion.

## I.
## BACKGROUND AND
## FACTUAL ALLEGATIONS

On July 11, 2015, Plaintiff James Albert Langley was injured in an automobile accident after he escaped from a work release program and stole a vehicle. When he was apprehended following the accident, he states he was bit on his left buttock by a K-9 officer. Plaintiff claims he asked to be transported to a hospital but, instead, he was taken from the scene to the Western Regional Jail (WRJ). Once at the WRJ, Plaintiff claims the nursing staff ordered a mobile x-ray. However, prior to being x-rayed, he was transferred to the Mount Olive Correctional Complex (MOCC) on July 13, where he was examined by Defendant Wexford's medical staff. At that time, it was noted that Plaintiff had abrasions to the left side of his forehead and knees, a

puncture wound to his left buttock with no sign of infection, and a nickel size rosy area to the left side of his head. *Defs.' Ex. 2,* Progress Notes (July 13, 2015), ECF No. 226-2. At the time, Plaintiff stated his head "sort of aches," and he was prescribed Motrin per protocol. *Id*. The next day Plaintiff's vital signs were taken, he was examined by a nurse practitioner, and notes were made on Plaintiff's chart about his accident and injuries. *Id*. The notes also indicate Plaintiff's gate was normal and he denied any numbness or tingling in his extremities. *Defs.' Ex. 4,* Progress Notes (July 14, 2015), ECF No. 226-4. A treatment plan was made, and Plaintiff was to report to medical staff of changes with his vision, hearing, or sensations. Based on a physical assessment, a skull x-ray was not indicated. *Id*.

On July 20, 2015, Plaintiff made an Inmate Medical Services Request (IMSR) complaining of "severe headaches," "extreme lower back pain," muscles spasms, finger numbness, and popping and cracking in his neck. *Pl.'s Ex. 3*, IMSR (July 20, 2015), ECF No. 229-4. The next day, he was seen by medical staff and complained of increased lower back pain, back spasms, and numbness and tingling in his hands and fingers. *Pl.'s Ex. 2*, Progress Notes (July 21, 2015), ECF No. 229-3, at 2. He was instructed to notify medical staff if his symptoms worsened. *Id.* at 3.

On July 24, 2015, Plaintiff again was examined by the nurse practitioner. *Id*. Plaintiff stated he had pain in his lower back, with radiation down the lateral half of his left leg and he continued to experience numbness and tingling. He denied any headaches or neck pain and his posture was normal. Motrin and an x-ray were ordered. *Id.* A lumbar x-ray was performed on July 28, and the results were normal. *Defs.' Ex. 7,* Radiology Report (July 28, 2015), ECF No. 226-7.

On July 30, 2015, Plaintiff filed another IMSR, complaining of pain, numbness, and radiculopathy. *Pl.'s Ex. 4*, IMSR (July 30, 2015), ECF No. 229-5. He requested a neck x-ray and MRI. On August 1, he filed a grievance, asking he receive an MRI from an outside doctor. *Pl.'s Ex. 5*, Inmate Grievance Form (Aug. 1, 2015), ECF No. 229-6. On August 3, Plaintiff again filed an IMSR and added that his lower abdomen was burning and looked as if he had a hernia. *Pl.'s Ex. 6*, IMSR (Aug. 3, 2015), ECF No. 229-7. Plaintiff was physically examined that same day, and his subjective complaints of back and neck pain, with tingling, and possible hernia, were documented. *Pl.'s Ex. 2*, Progress Notes (Aug. 3, 2015), at 3. Plaintiff was continued on Motrin.[1] Plaintiff's Grievance requesting outside treatment was denied by Defendant Donna Warden, a registered nurse and the Health Service Administrator for Defendant Wexford at the MOCC. *Pl.'s Ex. 5*, Inmate Grievance Form.

On August 20, Dr. Charles Lye performed a medical evaluation of Plaintiff. *Defs.' Ex. 12*, Progress Notes (Aug. 20, 2015), ECF No. 226-12. There were no complaints of neck or back pain, numbness, or a possible hernia documented in the treatment notes. Dr. Lye listened to Plaintiff's lungs and found them clear, with no congestion. *Id*.

On August 26, Plaintiff filed another IMSR stating he believes he has nerve damage in his right hand, with loss of motor skills. *Def.'s Ex. 13*, IMSR (Aug. 26, 2015), ECF No. 226-13. It also was noted that Plaintiff was having difficulty ambulating in his cell. In a Progress Notes made on that same day, Defendant Warden wrote that Plaintiff complained of nerve damage and

---

[1] On August 15, Plaintiff filed another IMSR, complaining that his medications were discontinued. *Pl.'s Ex. 7*, IMSR, ECF No. 229-8. Plaintiff's medications were renewed. *Id*.

asked to be seen by an outside provider. *Def.'s Ex. 14*, Progress Note (Aug. 26, 2015), ECF No. 226-14. She also wrote that she would communicate Plaintiff's concerns with Dr. Lye. *Id*.

On September 1, additional Progress Notes mention Plaintiff's continuous complaints of back and neck pain and tingling but, upon examination, it is noted he had a normal, steady gait. *Def.'s Ex. 14*, Progress Notes (Sept. 1, 2015), ECF No. 226-14. Motrin was given per protocol, and Plaintiff was referred for further evaluation. *Id*.

Plaintiff was examined again by Dr. Lye on September 10, and a cervical spine x-ray was ordered. *Id*. The Radiology Report signed by Kang Lu, MD, provided Plaintiff had "narrowing of the intervertebral disc space and endplate sclerosis at C5-C6, compatible with degenerative disc disease. There is no displaced fracture, significant spondylolisthesis or compression deformity. Prevertebral and neck soft tissues are grossly normal. Proximal airways and lung apices are clear." *Defs.' Ex. 17*, Radiology Report (Sept. 14, 2015), ECF No. 226-17. The Report further stated that "[f]or persistent clinical concern, cross-sectional imaging is recommended." *Id*.

On September 21, Plaintiff's vital signs were taken, and it was noted that Plaintiff said his pain was not getting better so he was referred for further evaluation. *Defs.' Ex. 18*, Progress Notes (Sept. 21, 2015), ECF No. 226-18. On September 24, Dr. Lye again examined Plaintiff. *Defs.' Ex. 18*, Progress Notes (Sept. 24, 2015), ECF No. 226-18. Dr. Lye reviewed Plaintiff's x-ray and conducted a physical examination. Dr. Lye determined there was no neurological defect.

*Id.* According to the Progress Note, no treatment was rendered because Plaintiff disagreed with Dr. Lye and walked away from the appointment. *Id.*

On September 28, Plaintiff filed a Grievance complaining that Dr. Lye made fun of his situation and refused to render medical treatment. *Pl.'s Ex. 13*, Inmate Grievance Form (Sept. 28, 2015), ECF No. 229-14. Plaintiff said he left the appointment because he was "furious." *Id.* Plaintiff requested he be treated by an outside doctor. *Id.* In her response, Defendant Warden stated Plaintiff did not get to pick his own provider and he did not receive treatment because he left before the appointment was finished. *Id.* On that same day, Plaintiff filed another IMSR, complaining of loss of motor skills, severe pain in his neck and shoulders, and knots in his muscles. *Defs.' Ex. 19*, Progress Notes (Sept. 28, 2015), ECF No. 226-19. He requested Motrin and treatment. *Id.* Ibuprofen was given per protocol. *Id.*

On October 1, 2015, Plaintiff filed an IMSR requesting Motrin for pain. *Pl.'s Ex. 15*, IMSR (Oct. 1, 2015), ECF No. 229-16. Again, it was provided to him. The same day, Plaintiff filed another Grievance stating he needed an MRI and outside treatment for nerve damage. *Pl.'s Ex. 16*, Inmate Grievance Form (Oct. 1, 2015), ECF No. 229-17. His Grievance was rejected for the reasons previously given. *Id.* The nurse practitioner did see Plaintiff the following day and prescribed Flexeril and Motrin, with a follow up recommended in one month. *Defs.' Ex. 21*, Progress Notes (Oct. 2, 2015), ECF No. 226-21.

During a medicine pass on October 6, Plaintiff was having a muscle spasm. Progress Notes from 5:20 a.m. indicate Plaintiff had a baseball-size knot that was tender to the

touch on the left side of his back. *Defs.' Ex. 21,* Progress Notes (Oct. 6, 2015), ECF No. 226-21. At 8:15 a.m., the Progress Notes indicate a unit was called to assess Plaintiff because he complained he was unable to stand because of a back spasm. *Id.* A nurse practitioner was consulted and Flexeril was given with a heated gel pack. *Id.* Plaintiff continued to complain of pain and difficulty standing the next morning. *Id.,* Progress Notes (Oct. 7, 2015). Plaintiff was examined and noted to be "holding breath [with] episodes of fast, shallow breathing." *Id.* Plaintiff was given a heat pack and medications as ordered with a follow up that day, if possible. At 2:15 p.m., Plaintiff was given additional medication, and reported minimal relief and was able to slowly walk to the door to get his medication. *Id.* Although Dr. Lye was on duty that day,[2] he did not see Plaintiff until the following day, October 8. *Defs.' Ex. 23,* Progress Notes (Oct. 8, 2015), ECF No. 226-23. At that time, Dr. Lye conducted a physical examination of Plaintiff. On the Progress Notes, Plaintiff's vital signs were written, together with Dr. Lye observations that gait and deep tendon reflexes in his knees were normal and he had no positive tingling. Dr. Lye found no new medication was necessary and wrote Plaintiff should receive symptomatic treatment. *Id.*

On October 11, 2015, Plaintiff filed another IMSR, stating his muscle spasms were making him short of breath and he had blood in his mucus when he blew his nose. *Pl.'s Ex. 19*, IMSR (Oct. 11, 2015), ECF No. 229-20. He was evaluated, his vital signs were taken, and his breath sounds were clear. Plaintiff was to be monitored. *Pl.'s Ex. 2*, Progress Notes (Oct. 11, 2015), at 11, 12.[3]

---

[2]*Pl.'s Ex. 17*, Wexford's Interrogatory Resp., ECF No. 229-18.

[3]The Court finds it is unclear whether Plaintiff was seen on October 10 or 11, or both. The Progress Note begins on one page and is dated October 10. Although difficult to read, it appears to be continued onto the next page, which is dated October 11. To the extent there is an error in

On October 13, Plaintiff filed a Grievance stating that he believed Dr. Lye was not rendering him appropriate care and he feared for his life because of nerve damage. *Pl.'s Ex. 20*, Inmate Grievance Form, ECF No. 229-21. He asked that he be permitted to see an outside specialist for an evaluation of his spine and nerve damage. Defendant Warden denied the request stating that Plaintiff's x-rays and clinical examinations do not indicate the need for an outside specialist and he would continue to be treated for his symptoms. *Id*.[4] Plaintiff's vitals were taken on October 16. *Defs.' Ex. 24*, Progress Notes (Oct. 16, 2015), ECF No. 226-24.

On October 18, Plaintiff filed an IMSR stating that he was "extremely congested [and] coughing up green mucus and [phlegm]," which tastes sour. *Pl.'s Ex. 22*, IMSR (Oct. 18, 2015), ECF No. 229-23. Plaintiff requested he be given antibiotics. *Id*. The next day he filed a similar request. *Pl.'s Ex. 23*, ECF No. 229-24. It was noted on the form that Plaintiff already was on the list to be seen. *Id*. Indeed, Plaintiff was seen the next day.

The Progress Notes from October 20 states that Plaintiff said he has felt sick since Friday, October 16. Plaintiff complained of coughing up green phlegm and feeling feverish. *Defs.' Ex. 27*, Progress Notes (Oct. 20, 2015), ECF No. 226-27. Although Plaintiff's vital signs were taken, the medical staff was unable to evaluate his lungs sounds because of his cough. *Id*. The nurse practitioner examined Plaintiff the following day. *Defs.' Ex. 28*, Progress Notes (Oct. 21, 2015), ECF No. 226-28. At that time, Plaintiff said he felt better and his shortness of breath had

---

recording the date, it clearly is inadvertent and makes no difference to this Court's decision.

[4]On October 13, Plaintiff also filed an IMSR to get his prescriptions refilled. *Pl.'s Ex*. 21, IMSR (Oct. 13, 2015), ECF No. 229-22. The IMSR was not ignored and referred to medical staff. *Id*. Plaintiff did not file a grievance or suggest the issue was not resolved.

improved, but it was not resolved. *Id.* Plaintiff continued to complain of back pain, his respiration was diminished on his left side, and tachycardia was noted. *Id*. A chest x-ray was conducted which showed "[l]eft lobar airspace disease and left pleural effusion commonly relates to pneumonia in the acute clinical setting with findings such as fever and leukocytosis." *Defs.' Ex. 29*, Radiology Report (Oct. 21, 2015), ECF No. 226-29. The radiologist recommended a CT workup. *Id.* Plaintiff was moved to the infirmary and started on antibiotics. *Defs.' Ex. 30*, Physician Orders (Oct. 21, 2015), ECF No. 226-30. The next day, he also was prescribed a steroid. *Id*., Physician Orders (Oct. 22, 2015).

On October 23, 2015, Plaintiff was examined by the nurse practitioner who diagnosed him with pneumonia. *Defs.' Ex. 32*, Progress Notes (Oct. 23, 2015), ECF No. 226-32. Another medication was started. *Defs.' Ex. 33*, Progress Notes (Oct. 23, 2015), ECF No. 226-33. Plaintiff's vital signs were monitored. His temperature on October 25 was 98.9 degrees and his temperature on October 27 was 98.4 degrees. *Defs.' Ex. 34*, Progress Notes (Oct. 25 & 27, 2015), ECF No. 226-34.

On October 28, Plaintiff again was examined by the nurse practitioner. *Defs.' Ex. 35*, Progress Notes (Oct. 28, 2015), ECF No. 226-35. Plaintiff complained of pain in his sternum, bilateral ribs, and center of his back. *Id*. He also had forceful coughing with sputum production, but his temperature was 97.6 degrees and he was found "not in acute distress." *Id*.

On October 30 and 31, nurses examined Plaintiff and found some swelling in Plaintiff's ankles and his groin area. *Defs.' Ex. 36*, Progress Notes (Oct. 30 & 31, 2015), ECF No.

226-36. On November 1, the nurse practitioner examined Plaintiff. *Defs.' Ex. 37*, Progress Notes (Nov. 1, 2015), ECF No. 226-37. Plaintiff's temperature was 98.1 degrees, but no breath sounds were heard in his left lower lobe, his ribs were tender to palpitation, and he had edema in a variety of areas. *Id*. Plaintiff was transported to Charleston Area Medical Center (CAMC) for evaluation. *Id*.

At the hospital, Plaintiff was admitted to the Intensive Care Unit for septic shock. *Defs.' Ex. 38*, CAMC Discharge Summary (Nov. 1-18, 2015), ECF No. 226-38. He then was taken to surgery where a thoracotomy was performed and empyema type effusion was found. A chest wall tube was implanted and broad-spectrum antibiotics administered and then deescalated to another antibiotic. Plaintiff's chest tube was surgically removed after approximately one week. Plaintiff was transferred back to prison on November 18, 2015 with an antibiotic and recommended monitoring of his chest. Plaintiff's discharge summary reflect a primary diagnoses of: "(1) Septic shock secondary to empyema[;] (2) Empyema contaminated by a strep Viridans group[;] (3) Chest wall abscess, again contaminated by strep Viridans group[; and] (4) Acute kidney injury secondary to hypotensive episode." *Id*. Once he was returned to prison, Plaintiff remained in the infirmary until December 15 and was monitored. *Defs.' Ex. 39*, Infirmary Admission and Discharge Summ., ECF No. 226-39. Plaintiff also had periodic chest x-rays on December 29, 2015; February 1, 2016; March 10, 2016; March 29, 2016, and September 26, 2016. *Defs.' Ex. 40*, Radiology Reports, ECF No. 226-40. The x-rays indicate Plaintiff's lungs were clear. *Id*.

In his Amended Complaint, which was filed *pro se*, Plaintiff alleges he did not receive adequate treatment despite repeated requests both through the IMSR and the grievance processes.[5] Although Plaintiff makes several specific complaints, the most serious of those allegations are that Plaintiff states he should have been given a CT scan based upon the recommendation made in the Radiology Report from October 21. *Am. Compl.*, at 6, ECF No. 50.[6] Instead, however, he states he was given high doses of antibiotics and steroids that damaged his kidneys and, by the time he was transferred to CAMC, he was nearly dead from sepsis. *Id.* Despite clearly being sick, Plaintiff alleges that Defendants refused to provide him outside treatment because of a money-saving policy and to prevent an outside doctor from learning of the inadequate treatment he had received. *Id.* at 7. He further alleges that Dr. Lye maliciously and sadistically tried to harm him. *Id*. With respect to Defendant Warden, he claims she denied his requests without ever looking into the issues he raised. Plaintiff asserts Defendants were deliberately indifferent to his basic human and medical needs and violated his Eighth Amendment Right against cruel and unusual punishment. Defendants Lye, Wexford, and Warden move for summary judgment on Plaintiff's claims.

## II.
## STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

---

[5]Plaintiff is now represented by counsel.

[6]Plaintiff also alleges that Dr. Lye ordered a chest x-ray on September 24, but it was not performed until October 21. However, the medical records show that Plaintiff had a cervical spine/neck x-ray on September 14, which was noted on Dr. Lye's Progress Note on September 24. At that time, Plaintiff was complaining of neck pain and numbness, and he left the appointment before any treatment could be rendered. The chest x-ray performed on October 21 was to evaluate Plaintiff's lungs.

Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III.
## DISCUSSION

It is well established that the Eighth Amendment's prohibition of cruel and unusual punishment requires prison officials "to provide 'humane conditions of confinement'" and is enforceable through 42 U.S.C. § 1983. *Salmons v. W. Reg'l Jail Auth.*, No. 3:18-1447, 2019 WL 5616916, at *4, 5 (S.D. W. Va. Oct. 30, 2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Commensurate with this constitutional obligation, prison officials must ensure inmates receive "'adequate . . . medical care[.]" *Id*. (quoting *Farmer*, 511 U.S. at 832). However, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)).

To establish a prima facie case, a "plaintiff must demonstrate that the [officials] acted with 'deliberate indifference' (subjective) to the inmate's 'serious medical needs' (objective)." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "[A] 'serious . . . medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id*. (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). It also includes "a condition for which lack of treatment causes continuous severe pain" *Salmons,* 2019 WL 5616916, at *7,[7] or one in which a "delay or denial of treatment causes unnecessary and wanton infliction of pain or life-long disability." *Skaggs v. Clark*, No. CV 3:13-3293, 2016 WL 1271512, at *6 (S.D. W. Va. Mar. 31, 2016) (internal quotation marks and citations omitted).

If a plaintiff meets the objective standard of a serious medical need, the Court also must determine "'whether *subjectively* the officials acted with a sufficiently culpable state of mind.'" *Salmons,* 2019 WL 5616916, at *5 (quoting *Strickler v. Waters*, 989 F.2d at 1375, 1379 (4th Cir. 1993); emphasis in *Strickler*). In other words, a plaintiff must show the official acted with "deliberate indifference." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference is shown when the "prison official actually kn[e]w of and disregard[ed] an objectively serious condition, medical need, or risk of harm." *Id*. "[D]eliberate indifference entails something more than mere negligence" but "less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmers*, 511 U.S. at 835. "To establish that a health care provider's actions constitute deliberate

---

[7]*Internal quotation marks and citations omitted.*

indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted).[8] "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. A mere "error of judgment" by medical staff, "while perhaps sufficient to support an action for malpractice, will not constitute a constitutional deprivation redressable under § 1983." *Wynn v. Mundo*, 367 F. Supp. 2d 832, 837 (M.D. N.C.), aff'd, 142 F. App'x 193 (4th Cir. 2005) (internal quotation marks and citations omitted).

In applying these factors to the evidence in this case, the Court easily finds sufficient evidence to establish that Plaintiff had objectively serious medical needs. With doubt, Plaintiff's pneumonia, MRSA, sepsis, and his other diagnoses that required his hospitalization were very serious medical needs that required life-saving treatment. Likewise, although not nearly so dire, the Court shall assume that Plaintiff's complaints related to his neck and back are sufficient to meet the objective standard. As demonstrated by the medical records, Plaintiff fairly consistently complained of significant pain, numbness, and tingling, and occasional spasms and knots, and there were times in which he experienced some difficulty ambulating. Although Plaintiff's subjective complaints in and of themselves may be insufficient to cross the objective threshold, the medical records indicate Plaintiff was in need of medical attention, and he was evaluated and treated by Dr. Lye, the nurse practitioner, and the medical staff for these complaints.

---

[8]*Overruled in part on other grounds by Farmer*, 511 U.S. at 837.

However, even assuming arguendo that Plaintiff's back condition presented a serious medical need, the record fails to show that Defendants were deliberately indifferent to that need. To the contrary, the record shows that Dr. Lye and the medical staff at the facility provided Plaintiff with extensive medical care and attention in efforts to address Plaintiff's complaints. Plaintiff initially was examined upon his entry to the facility on July 13. At that time, there is nothing in the Progress Notes indicating Plaintiff was experiencing back pain. The next day he was examined again, but he had a normal gate and he made no complaints about his back and denied any numbness or tingling in his extremities. His first complaint about back pain in the record appears on July 20, when he filed an IMSR. He was evaluated the very next day and given Motrin. He was seen again on July 24 and a lumbar x-ray was ordered. The x-ray was taken on July 28, and it was normal. Plaintiff was seen again on August 3, August 20, September 1, September 10, September 21, September 24, October 2, October 6, October 7, October 8, October 10, and October 16, in addition to the care he received after complaining of congestion and developing pneumonia. Plaintiff also was given a cervical spine x-ray on September 14, which showed some degenerative disc disease. Plaintiff was regularly prescribed Motrin and Flexeril and given heat packs to treat his symptoms. This case is not one, as is suggested by Plaintiff, in which his symptoms were ignored. To the contrary, Plaintiff's back was evaluated and treated on a regular basis. Although Plaintiff is unhappy with the care he received for his back, no reasonable juror could find that Dr. Lye and the medical staff at the facility acted with deliberate indifference to his medical needs. In fact, quite the opposite is true.

Plaintiff also complains that Dr. Lye and Defendant Wexford refused to send him to outside specialist and order a CT scan and MRI of his back because of a cost-saving policy

and/or custom.⁹ However, Plaintiff does not have a constitutional right to choose his provider or his course of treatment so long as his care is adequate. *See Lowe v. Johnson*, No. 19-6353, 2020 WL 1274529, at *1 (4th Cir. Mar. 17, 2020) (stating "a prisoner does not enjoy a constitutional right to the treatment of his . . . choice so long as the medical treatment provided is adequate" (internal quotation marks and citations omitted)); *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) (stating the "essential test is one of medical necessity and not simply that which may be considered desirable"). Here, Plaintiff has not offered any medical opinions that the care he received was inadequate. Although the Radiology Report from September 14 suggests the possibility Plaintiff receive a CT scan, the Report expressly provided, "[f]or persistent clinical concern, cross-sectional imaging is recommended." *Defs.' Ex. 17*, Radiology Report. At the very next appointment on September 24, Dr. Lye reviewed the report, conducted a physical examination, and determined there was no neurological defect. *Defs.' Ex. 18*, Progress Notes. Plaintiff disagreed and left the appointment before treatment was rendered. Not only was Dr. Lye not required to follow the recommendation on the Radiology Report, it does not appear from the Progress Notes that he found a persistent clinical concern that warranted a scan. Plaintiff's mere opinion that his care was inadequate and he should have been referred to an outside specialist is simply not enough. Thus, to the extent Plaintiff's claim rests on the care and treatment he received for his back, the Court **GRANTS** summary judgment in favor of Defendants Lye and Wexford.¹⁰

---

⁹Defendants deny that such a policy exists.

¹⁰The Court declines to address the parties' arguments about whether a cost-saving policy and/or custom existed because Plaintiff has failed to show that he should have received outside treatment in the first instance.

Turning next to Plaintiff's pneumonia and related conditions that required his hospitalization. Initially, the Court finds there is no medical evidence connecting Plaintiff's pneumonia with his back complaints.[11] Therefore, the Court finds them to be separate events. With respect to the pneumonia, although Plaintiff reported in an IMSR on October 11 that he had some blood in his mucus when he blew his nose, Plaintiff was examined, his vital signs were taken, and his breath sounds were clear. *Pl.'s Ex. 2*, Progress Notes, at 11, 12. There was nothing indicating there was a serious problem at that point in time.

Plaintiff first complained of a more significant problem on October 18, when he filed an IMSR stating he was "extremely congested [and] coughing up green mucus and [phlegm]," which tastes sour. *Pl.'s Ex. 22*, IMSR.[12] Plaintiff was evaluated on October 20, and he said he had felt sick since October 16. Plaintiff complained of coughing up green phlegm and feeling feverish. *Defs.' Ex. 27*, Progress Notes. At that time, Plaintiff's coughing prevented the medical staff from evaluating his lungs sounds, but the next day he was examined by a nurse practitioner. *Id.*; *Defs.' Ex. 28*, Progress Notes (Oct. 21, 2015), ECF No. 226-27. As Plaintiff's issue had not resolved, he

---

[11]In fact, the opposite is true. Defendants submitted an Affidavit from Richard A. Capito, M.D, a board certified Internal Medicine Physician and a board certified Emergency Physician, to support its position that Plaintiff's complaints of back pain and his pneumonia are unrelated to one another. *Defs. Ex. 42*, Affidavit of Richard A. Capito, ECF No. 226-42. Dr. Capito reviewed the medical record and noted Plaintiff did not complain of respiratory symptoms until October 19. He found no evidence showing any injuries Plaintiff sustained in the motor vehicle accident led to the development of his pneumonia. *Id*. Plaintiff has not submitted any evidence to refute this Affidavit.

[12]In his Response, Plaintiff also points to the Grievance he filed on October 13, in which he said he was having breathing problems. However, Plaintiff relates his breathing problem at that time to his muscle problems, not to a respiratory illness. Specifically, Plaintiff stated, in part, that "with these muscles acting the way they are I can't even walk from my bed to the door without being winded going into an asthma attack. It feels as if I have a band wrapped around my torso squeezing the air out of me." *Defs.' Ex. 20*, Inmate Grievance Form. Plaintiff said he did not start feeling sick until October 16.

had diminished respiration, and tachycardia, the nurse practitioner ordered a chest x-ray. *Id.* The chest x-ray showed "[l]eft lobar airspace disease and left pleural effusion commonly relates to pneumonia in the acute clinical setting with findings such as fever and leukocytosis." *Defs.' Ex. 29*, Radiology Report. A CT workup also was recommended. *Id.* Plaintiff was moved to the infirmary and a course of medication was ordered and administered. *Defs.' Ex. 30*, Physician Orders. On October 23, 2015, Plaintiff was diagnosed with pneumonia, and additional medication was given. *Defs.' Exs. 32, 33*, Progress Notes. Plaintiff's vital signs continued to be monitored, and his temperature remained normal.

On October 28, a nurse practitioner examined Plaintiff and noted forceful coughing with sputum production, but his temperature was 97.6 degrees and he was "not in acute distress." *Defs.' Ex. 35*, Progress Notes. Plaintiff remained in the infirmary and received treatment, but on October 30 and 31 swelling was noted. *Defs.' Ex. 36*, Progress Notes.

A nurse practitioner again examined Plaintiff on November 1. *Defs.' Ex. 37*, Progress Notes. Although his temperature was normal, there were no breath sounds in his left lower lobe, his ribs were tender, and edema was found. *Id*. Therefore, he was transferred to CAMC where he underwent surgery and was treated until November 18. *Defs.' Ex. 38*, CAMC Discharge Summary.

Plaintiff argues the evidence shows he should have received a CT scan, following the recommendation on the Radiology Report on October 21. However, once again, it merely was a recommendation, and Plaintiff relies solely on his personal opinion to support his position that it

should have been done. Plaintiff presented no medical opinion that a CT scan was an absolute necessity at that point in time or that it otherwise was required in order for him to receive adequate care and treatment.

Despite not getting a CT scan, Plaintiff was transferred to the infirmary and was actively monitored and treated. Plaintiff complains that, while he was in the infirmary, Wexford's Policy and Procedure Manual was violated because he was never examined by Dr. Lye and he was not seen by the nurse practitioner the required number of times. Additionally, Plaintiff states his high white blood count on October 29, which was a clear indication of infection that should have been addressed by Dr. Lye or, at the very least, by the nurse practitioner. The nurse practitioner, however, did not see him again until October 31. By that time, Plaintiff states it was obvious he was not responding to the treatment regimen. When he finally was taken to CAMC the next day, he was given a CT scan, which showed a collapsed left lung and chest wall infection.

Although Plaintiff insists it was obvious his care was inadequate, the Court disagrees and reiterates that his mere opinions about what constitutes adequate care is insufficient to defeat summary judgment in light of the evidence presented in this case. In fact, Defendants refute Plaintiff's subjective opinions with an Affidavit by Thomas Parker, M.D., a board certified Internal Medicine, Pulmonary Medicine, an Critical Care Medicine physician. *Defs.' Ex. 43*, Affidavit of Thomas Parker, M.D. (June 18, 2019), ECF No. 226-43.

In his Affidavit, Dr. Parker opined that Plaintiff's treatment would have been the same even if he had received a CT scan on October 21. *Id*. at 2. Dr. Parker stated that Plaintiff

"was appropriately treated with antibiotics and corticosteroids[, and it] met the standard of care." *Id*. at 1. Dr. Parker opined that such drug treatment "was appropriate . . . before undergoing surgery for the empyema" and the surgery was not performed until after he failed to respond to the medicine. *Id*. Dr. Parker further opined that "[n]othing else could have been done to avoid the need for surgery," and Plaintiff had made a complete recovery. *Id*. at 1, 2.[13] Given the totality of the evidence and viewing all underlying facts and inferences in the light most favorable to Plaintiff, the Court finds Plaintiff's claim related to his pneumonia cannot survive Defendants' summary judgment motion.

Finally, the Court turns to the claims against Defendant Warden, who Plaintiff claims should be held liable under a theory of supervisor liability in her capacity as a Health Care Administer. However, as the Court has found no underlying liability, Plaintiff's theory necessarily fails. Moreover, in any event, the Court does not find Defendant Warden was deliberate indifferent to Plaintiff's situation in her responses to his Grievances. Therefore, she too is entitled to summary judgment.

## IV.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court **GRANTS** Defendants Wexford Health Sources, Inc. (Wexford), Charles Lye, M.D., and Donna Warden's Motion for Summary Judgment. ECF No. 226. Additionally, as Alex Marshall previously was named as the "Arresting Officer"[14] and no other "Arresting Officers" have ever been identified and the time period for

---

[13] Dr. Parker also stated that the motor vehicle accident had nothing to do with the development of pneumonia. *Id*. at 2.

[14] The claims against Officer Marshall were settled on July 6, 2018.

doing so has long past, the Court *sua sponte* dismisses any remaining claims against the "Arresting Officers" that remain in this case.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

        ENTER:     March 31, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE